TIMMY J. WEBER, APPELLANT, *v.* THE STATE
OF NEVADA, RESPONDENT.

No. 41525

September 15, 2005                                    119 P.3d 107

*Philip J. Kohn,* Public Defender, and *Willard N. Ewing* and *Robert L. Miller,* Deputy Public Defenders, Clark County, for Appellant.

*Brian Sandoval,* Attorney General, Carson City; *David J. Roger,* District Attorney, *Steven S. Owens,* Chief Deputy District Attorney, and *Christopher J. Lalli,* Deputy District Attorney, Clark County, for Respondent.

## OPINION

By the Court, BECKER, C. J.:

Appellant Timmy J. Weber lived in Las Vegas with his girlfriend of about five years, Kim. Kim's 17-year-old son C., 15-year-old son A., and 14-year-old daughter M. also lived with Kim and Weber. Weber subjected M. to ongoing sexual abuse during this time and took pornographic photographs of the abuse. On the morning of April 4, 2002, Weber sexually assaulted M. and murdered A. and Kim. He immediately fled and traveled through several states. He reappeared in Las Vegas on April 14, the day of A. and Kim's funeral, when he attempted to murder C. and another person.

Weber was arrested two weeks later and charged with 17 felony counts, including two counts of murder with the use of a deadly weapon. After a jury trial, Weber was convicted of all the charges. For A.'s murder, the jury found 13 aggravating circumstances and returned a verdict of death. For Kim's murder, Weber was sentenced to life in prison without the possibility of parole.

Weber raises several issues on appeal. Although we conclude that some trial error occurred, any error was harmless beyond a reasonable doubt. We therefore affirm Weber's judgment of conviction and sentence of death.

## FACTS

*Guilt phase*

Although Weber was Kim's boyfriend, he had an unhealthy relationship with her daughter, M., who was 14 years old when most of the crimes in this case occurred. Kim's older son, 17-year-old C., described Weber's relationship with his sister as one where the two were "overly affectionate towards one another." Sometimes Weber would "hang out" with M. all day long, buy her things, or take her to get her nails done. Weber was also protective of M. and made particular efforts to ensure that her brothers' friends could never associate with her. One of Kim's coworkers stated that Weber "treated [M.] more like his girlfriend than he did Kim, instead of a stepdaughter or child."

On April 3, 2002, Kim, her children, and Weber were in the process of moving into a new home, a trailer, in Las Vegas. M. testified that she had withdrawn from school because of the move and was home that day. Kim was not at home, but Weber was. M.'s friends were calling to say goodbye. When an African-American friend called for M. that evening, Weber answered the telephone and cursed at the boy. When M. told Weber that he should not curse at her friends, he told her that she did not need "fucking niggers," called her a "ho," and said that she "probably had sex with the dude." Weber's behavior upset M. She testified that she and Weber "would have arguments about just little things, like cleaning the room or something, but never like this." When she told her mother about the incident later that night, Kim yelled at Weber, and the two argued. Weber apologized to M. later that night, but she refused to accept the apology.

The next morning, on April 4, Kim went to visit her friend Robin Thornton. They talked about the arguments between Kim and Weber and between M. and Weber. Kim received telephone calls from Weber while she was at Thornton's home. Thornton testified, after unsuccessful objection by defense counsel, as to what Kim told her that morning. Kim left Thornton's a little before 11:00 a.m.

M. testified she was home alone with Weber that morning. Her oldest brother C. had spent the night at his friend Joey's apartment. Her other brother, 15-year-old A., had left to go skateboarding. As M. sat on the couch watching television, Weber told her to give him a hug. Still upset about the previous night, M. refused and told Weber that she wanted to go see her boyfriend. Weber then walked to the front door and closed it. He returned and pinned M. on the couch, duct-taped her hands together behind her back, and forced her into her bedroom. M. was scared and scream-

ing. Weber told her to shut up, put duct tape around her head, and forced her into A.'s bedroom. Weber threw her on the bed and "hog tied" her.

As M. explained, "he taped each leg, each foot individually, and he tied them together. And then he brought up my legs and connected them to my hands and then he tied tape around my thighs so I [couldn't] open my thighs." Weber told M. that if she tried to escape he would kill her and that it would be easy to do. He turned up the volume of a radio "really loud" and told M. that she would be tied up until her mother returned home. He then left M. alone for a time. Other evidence established that Weber went to a Walgreen's store and purchased three large rolls of duct tape at 11:39 a.m. that morning.

M. testified that about 45 minutes after leaving her, Weber returned, cut the tape off her, and forced her into her own bedroom. Weber ordered her to undress, and she did. He then told M. that he was going to have sex with her, but she said that she could not because her hand hurt—Weber had cut her hand while cutting off the tape. Weber briefly left M. and returned with two ice packs and placed them on her hand. M. was crying, shivering, and lying on her bunk bed. Weber lay behind her, put on lubrication, inserted his penis into her vagina, and had sex with her. M. observed a clock in her bedroom that showed the time as 12:32 p.m. Afterwards, she went into the bathroom, used her mother's douche, and took a shower.

After the shower, despite her pleas, Weber told M. that he would have to tie her up again. Wearing only a towel, M. was taken back into her bedroom. Weber put socks over her hands, duct-taped them, and then duct-taped her legs together. He also duct-taped her head and body to the ladder of her bunk bed so that she could not move. Weber tried to stuff a sock in M.'s mouth, but she kept spitting it out. He then said that he was going to go check on her brother A. and would be back in five minutes. He turned up a television "really, really loud," covered her with a blanket, and left.

M.'s two brothers C. and A. had been hanging out that morning at their friend Joey's apartment, smoking marijuana, watching television, and playing video games. C. fell asleep on the couch, while A. and Joey skateboarded to a nearby gas station for snacks. A. and Joey were returning to the apartment around 2:30 p.m. when they saw Weber sitting in his car. A. went to talk to him. A few minutes later, A. returned to the apartment and told Joey that Weber said that A. had to go check in with his mother, Kim, and that she was going to give him $10. A. told Joey that he would try to be back before Joey left for work, around 3:45 p.m., or would see him later that night. As A. was leaving, another friend, Tony,

arrived. Tony saw A., carrying his skateboard, get into a car with Weber and drive away.

About a half hour later, C. awoke from his nap in Joey's apartment. He decided to go home. When he arrived home, it was about 3:30 p.m. All of the doors were locked. C. tried to enter the house through a window but could not. He heard a television turned up very loud in M.'s bedroom. C. knocked on the window, and M. screamed when she heard the knocking. C. thought he heard a muffled scream but was not sure. So he returned to Joey's apartment to get some help. His friend Kareem was at the apartment and agreed to return with him to the house. When they reached the house, they heard M.'s screams. C. broke a window, entered, and let Kareem in through the front door. They found M. in her bedroom naked under a sheet and tied up with duct tape. C. uncovered her taped mouth and asked her who did it; she replied that it was Weber and warned that if Weber "finds out you guys know, he's going to kill us."

Kareem finished freeing M. while C. tried to call the police. The telephone was unplugged. After plugging in the telephone, he called 911 but was placed on hold by a recorded message. Fearing that Weber would return, the three left the house. C. gave M. his bicycle and told her to ride to Joey's apartment. C. and Kareem walked back to the apartment together. Because Joey's apartment did not have a telephone, C. went to a nearby gas station and called the police from a pay phone.

While C. was using the pay phone, Weber drove up to Joey's apartment. Weber asked Kareem, who was standing on the front porch of the apartment, if he had seen M. Kareem replied, "I don't know what you're talking about," and Weber drove away. Kareem then saw a police car driving by and frantically waved his arms. Nevada Highway Patrol Sergeant Philip Dart stopped and spoke with Kareem and M. Still crying and "very upset," M. told Sergeant Dart that Weber had tied her up for about five hours and forced her to have sex. Sergeant Dart noticed that M.'s knees and wrists were irritated and covered with a light gray residue from some type of adhesive.

C. returned to Joey's apartment, and M. repeatedly asked to speak with her mother. She thought that Kim was at the new trailer getting it ready for the family's move, but neither C. nor M. had Kim's cellphone number. So C. and M. returned with two troopers to the home to get the number. By this time, it was about 4:00 p.m. The troopers conducted a protective sweep of the home, and Sergeant Dart found A.'s body lying on a bed. The locked door to another bedroom was kicked open, and Kim's body was found in the bedroom closet.

After securing a telephonic search warrant, several Las Vegas Metropolitan Police Department (LVMPD) detectives and crime

scene analysts reentered the home. Inside they found rolls of duct tape, torn pieces of duct tape with hair-like fibers attached, a roll of black plastic garbage bags, a pair of socks with duct tape on them, and a used douche bottle. In a garbage can, investigators found a plastic bag and receipt for duct tape from Walgreen's. They also found a ripped-up greeting card dated April 3, 2002, written by Kim to Weber that read:

> T.J., I love you with all my heart. I do not like some things you do, but that does not mean that I don't love you. I downright hate some things you do.
>
> T.J., you are so smart, so cute, so giving, so good, but you are so far away from me, it hurts.
>
> Please come back. I don't want to lose you. I can only take so much pain. The kids do not need any. If you love me, show me, please.
>
> Love, Kim. Love you, T.J.
>
> P.S.: I don't have all the answers, but I'll look for them if you let me.

Dr. Gary Telgenhoff of the Clark County Coroner's Office initially viewed A.'s body at the crime scene and later performed the autopsy. A.'s body was found in his bedroom lying face down on his bed, partially covered by a bed comforter. His head was covered with a black plastic bag, and an electrical cord was tied around his neck. (An LVMPD Crime Scene Analyst who also examined A.'s body stated that the electrical cord was around A.'s legs and a tie string bound the bag around his neck.) A mixture of blood, vomit, and hair was in the bag covering his head. His arms, hands, and wrists were bound behind his back with duct tape, and his ankles were bound together by duct tape. A white t-shirt was stuffed inside his mouth, and duct tape was wrapped around his head, covering his eyes and mouth. Two 45-pound dumbbell weights were on his upper and lower back, and two 50-pound weights were on his legs. In addition to a split lip and bloody gums, A. had sustained injuries to his knees, elbow, and ankle that either could have been caused at the time of his death or could have had an earlier cause, such as skateboarding accidents.

Dr. Telgenhoff determined that A. died from "[m]echanical asphyxia, suffocation, compression and restriction of the torso." Tears in the duct tape around A.'s hands indicated that he struggled to free himself, and the presence of blood and vomit in the bag around his head—which must have exited through his nostrils—indicated that the process of A.'s death was "very, very slow."

Kim's body was found naked and stuffed inside a Rubbermaid container in her bedroom closet. A black plastic bag was over her

head, and a sheet was tied around her ankles. Dr. Telgenhoff also performed her autopsy. Her neck contained a number of marks suggesting that pressure had been applied by some type of ligature, but no ligature was ever found. Two wounds on the back of her head were diagnosed as "blunt force trauma" caused by a blunt object that fractured her skull. She also had bruising and scrapes on her arm and knees. Dr. Telgenhoff determined that Kim's primary cause of death was blunt force trauma to the head and that strangulation may have been a secondary cause.

A palm print lifted from M.'s bunk bed and a fingerprint found on duct tape wrapped around A.'s ankle were later matched to Weber. Several of Weber's fingerprints were also found on two rolls of duct tape found inside the home and on the Walgreen's plastic bag found in the garbage. His palm print was found on the roll of black plastic bags.

Registered Nurse Linda Ebbert performed a sexual assault examination on M., after Kim's body was discovered. Ebbert observed that

> [M.] had multiple areas where there was tape debris on her. She had it on the mouth, on the neck, both arms, both legs; and she had bruising on the inside of her mouth where she said she had tried to chew through the tape so she would be able to yell for help.

In addition to bruising on M.'s thigh and a small laceration on her arm, Nurse Ebbert observed that she had abrasions in her vaginal canal and a bruise on her cervix. This bruise indicated that nonconsensual sexual intercourse may have occurred because when a woman is sexually aroused the cervix normally pulls out of the way. According to Ebbert, M.'s account of events was consistent with her injuries, and she observed nothing causing her to believe that M. experienced consensual sex. DNA analysis of semen collected from M.'s vagina determined that the semen belonged to Weber.

On the night of April 4, M. was interviewed by an LVMPD detective and was specifically asked whether Weber had ever previously had or attempted sexual intercourse with her. M. replied, "No. Never." During another interview with detectives four days later, M. repeated her denials that any sexual contact between her and Weber had ever occurred.

At the second interview, M. informed detectives that Weber possessed various credit cards and had the ability to make false identifications. Kim's friend, Thornton, also informed detectives that Weber was very computer literate and may have been involved with some "scam" on the Internet. Weber owned a computer, and

a warrant was obtained to search it and any related media. LVMPD Forensic Computer Examiner Larry Smith conducted the search of the computer. When he observed materials that appeared to be child pornography on some of Weber's floppy disks, he obtained an additional search warrant. After resuming his search, Examiner Smith discovered more items of child pornography, including photos of M. and Weber engaged in sexual activity.

A warrant was issued for Weber's arrest, but he remained at large. His car was discovered on April 10 in the parking lot of a Las Vegas casino. Inside the car was a skateboard and a parking receipt dated April 4. The LVMPD contacted the Federal Bureau of Investigations for assistance in locating Weber. The FBI determined that Weber had left Las Vegas on a Greyhound Bus and arrived in Bakersfield, California, early in the morning on April 5. Later that day, he used his ATM bank card in the Greyhound Bus terminals in Fresno and Sacramento. Video surveillance also recorded Weber at the Sacramento terminal on that date. Weber's ATM bank card was used the following day in Portland, Oregon, and on April 8 in Seattle, Washington. While in Seattle, Weber called a costume shop. The FBI determined that someone matching Weber's description had purchased a fake moustache from the shop. Weber was then traced to Boise, Idaho, and two days later to Fremont, Utah. The next day, Weber made a call from Salt Lake City. By the following day, April 12, Weber had returned to Las Vegas.

Meanwhile, M. and C. had been placed in the temporary custody of William Froman and his wife. Froman was a middle school teacher familiar with Kim and her children. A. and Kim's funeral services were scheduled for April 14. Before services that day, C. returned to his home with Froman to obtain some clothes and mementos to place in A.'s grave. Concerned about Weber, both C. and Froman carried baton-type clubs.

As Froman entered the home, Weber rushed from behind a door and hit him on the head with a baseball bat. Froman fell over, and Weber hit him in the eye and the elbow with the bat. Froman got up and charged Weber, and a struggle ensued. Weber said, "I'm going to kill you motherfuckers." C. hit Weber a few times with his club, but Weber hit C. and knocked him down. Froman ran out of the house to get another weapon from his truck, while Weber continued fighting with C. Weber then came out of the house and said to Froman, "Give me the truck or I'm going to go in the house and kill [C.] too." Froman tried to run Weber over with the truck, but Weber ran back into the house. Froman rammed the front of the house with his truck, honked his horn, and yelled for help. After chasing C. out the back of the house, Weber ran away. Both C. and Froman were bleeding from their injuries. Froman

had a fractured skull and later received stitches on his face and head.

In investigating the attack upon C. and Froman, LVMPD detectives discovered a police seal missing from the back door of the home, and a door lock had been super-glued so that entry could be gained anytime. Two weeks later, on April 28, neighbors of the trailer into which Kim and Weber had planned to move noticed a garbage bag over a window that had not been there earlier in the day. Suspecting trouble, the neighbors called the police. When police responded, they found Weber inside the trailer and arrested him without incident.

On April 30, detectives interviewed M. again. During this videotaped interview, detectives told M. about the photos found on Weber's computer. M. then admitted that she had been frequently raped by Weber both orally and vaginally before the April 4 incident. M. said the rapes began about five years earlier when she was 9 or 10 years old and in the third grade. Weber told her it was their secret and not to tell anyone. The first time it occurred, M. stated, Weber inserted his penis into her vagina, and she was screaming and bled onto a towel. She had no pubic hair or developed breasts at that time. M. also said that Weber made her smile and pose for the photos and that the conduct was against her will. M. had not disclosed this information before because she was embarrassed and scared.

In May 2002, a grand jury returned an indictment against Weber, which was later amended, charging him with 17 felony counts: sexual assault on a child under 14 (Count 1), sexual assault on a child under 16 (Counts 2, 3, and 11), open or gross lewdness (Counts 4, 5, and 6), use of a minor in producing pornography (Count 7), possession of a visual presentation depicting sexual conduct of a person under 16 (Count 8), burglary (Counts 9 and 15), first-degree kidnapping (Counts 10 and 13), open murder with the use of a deadly weapon (Counts 12 and 14), and attempted murder with the use of a deadly weapon (Counts 16 and 17). The State then filed notice of its intent to seek the death penalty.

Weber's jury trial was held in February 2003. The State presented the evidence summarized above. Weber called several witnesses to testify in his defense, including child forensic psychiatrist Dr. Rayna Rogers. Dr. Rogers reviewed a variety of materials related to the case, including the videotaped interview between M. and LVMPD detectives. She criticized one interviewing female detective for not maintaining the stance of a neutral investigator, for adopting the role of M.'s advocate, for suggesting information to M., and for asking M. leading questions.

After five days of deliberations, the jury returned a verdict finding Weber guilty of all 17 felony counts, including two counts of first-degree murder with the use of a deadly weapon for the deaths of A. and Kim.

### Penalty phase

The State called three witnesses during Weber's penalty hearing. A Sergeant with the LVMPD testified about Weber's criminal history. As a juvenile, Weber had several arrests and was convicted in 1990 of burglary, conspiracy to commit burglary, and possession of stolen property. As an adult, Weber had multiple arrests and convictions in both California and Nevada. Most of these offenses involved property crimes. In 1992, Weber was convicted of four felonies: two counts of burglary, attempted second-degree burglary, and possession of stolen property. In 1994, Weber was again convicted of felony possession of stolen property. The following year, he was convicted of two more felonies: burglary and grand larceny. In 2000, Weber was convicted of one gross-misdemeanor count of malicious destruction of private property for an incident at his and Kim's home.

C. testified that he missed his brother A., saying: "He was fun to be around. He was one of those kids where, if you were down, he would come in the room, put a smile on your face." C. added:

> He was a handsome kid. He had girls that liked him. He planned on having kids when he grew up and having a family life and all that good stuff and going to college and having nice cars and friends and family to hang around with. And now he doesn't have that opportunity.

About his mother, C. said:

> Yeah. My mom may have had drug problems, but like everybody, people have problems and they can be helped, and she never had the opportunity to be helped with them.
>
> I don't want to say she was a bad person. She never brought drugs in the house or never involved us with the drugs, so she was a good parent.
>
> If we wanted to wear what neighbor kids wore to school, name brand clothes, she worked the extra hours to put name brand clothes on us, so she would make sure she put forth that effort.

Kim's half sister testified that Kim "had the type of personality that, like A. in a lot of ways, she would walk into a room and just light it up."

Weber called several witnesses for his case in mitigation. Psychologist Dr. Louis Etcoff testified that based on his evalua-

tions, which included interviews with Weber and his mother, Weber's "childhood history was normal, medically and behaviorally." On the other hand, Dr. Etcoff added that Weber's parents separated when he was only one year old, his father spent numerous years in prison, and his mother was sent to prison for a while when he was in kindergarten. Dr. Etcoff testified that Weber likely had obsessive compulsive disorder and was more likely to be suicidal than most people, but Weber was not depressed or psychotic, and there was no indication that he experienced any physical or sexual abuse as a child. Although Weber had a prior criminal record, Dr. Etcoff noted that Weber did not have a previous history of violence—his prior crimes were mostly property offenses. Dr. Etcoff concluded that Weber "will likely be a quiet, self-effacing, isolated prisoner, not prone to making trouble or aggressive or violent; possibly the type of prisoner who would be taken advantage of by stronger prisoners." On cross-examination, Dr. Etcoff testified that Weber denied having deviant sexual thoughts.

Weber's two aunts, Linda Bailey and Susan Berthiaume, essentially testified that Weber was "a well adjusted" and "[h]appy go lucky, loving, smiling" child. According to Susan Berthiaume, when Weber was previously in prison, he finished his education and "bettered himself." Weber's cousins, Donald Berthiaume and Nancy Roberts, also testified. Donald Berthiaume pleaded: "I don't want him to die. He's like a brother to me." Roberts said that Weber came from a "close-knit" family and that as a child he "wouldn't pick a fight with anybody." She added that Weber's family would continue to have contact with him while he was in prison.

Finally, a letter written by Weber's mother was read. She wrote that she loved her son and that Weber's father had abused him as a toddler. She also wrote that Weber was moved around "a lot" while growing up, living at times in Illinois, Kentucky, California, and Nevada. The letter concluded: "I beg you to spare his life."

The jury unanimously found 13 aggravators in A.'s murder. Aggravators one through eight each provided that before the penalty hearing Weber had been "convicted of a felony involving the use or threat of violence to the person of another." These first eight aggravators were based, respectively, on the following felonies charged in the amended indictment: sexual assault on a child under the age of 14 (Count 1 of the amended indictment), sexual assault on a child under the age of 16 (Count 2), sexual assault on a child under the age of 16 (Count 3), first-degree kidnapping of M. (Count 10), sexual assault on a child under the age of 16 (Count 11), first-degree kidnapping of A. (Count 13), attempted murder of C. with use of a deadly weapon (Count 16), and attempted murder of Froman with use of a deadly weapon (Count 17).

Aggravators nine through eleven provided that Weber committed the murder while engaged in the commission of a burglary or first-degree kidnapping and that he killed the person murdered. These aggravators were based, respectively, on burglary (Count 9 of the amended indictment), first-degree kidnapping of M. (Count 10), and first-degree kidnapping of A. (Count 13).

Aggravator twelve provided that the murder involved the torture or mutilation of A. Finally, aggravator thirteen provided that Weber had, "in the immediate proceeding, been convicted of more than one offense of murder."

Jurors also found 13 mitigating circumstances, including: Weber had an unstable upbringing; his family loved him; his family would suffer as a result of the imposition of a death sentence; he had a history of good behavior at the Clark County Detention Center and the Nevada State Prison; he had no prior history of crimes of violence; his age at the time of his prior criminal history; his current age; he did not resist arrest; he had a normal upbringing; his lack of financial stability; his display of emotion during the penalty phase.

The jury found that the aggravating circumstances outweighed the mitigating circumstances and sentenced Weber to death for A.'s murder.

In regard to Kim's murder, the State alleged 12 aggravating circumstances. With the exception of torture, the aggravators charged in Kim's murder were identical to those charged in A.'s murder. Although the jury found all 12 aggravators and that the aggravating circumstances outweighed the mitigating circumstances, it returned a sentence of life in prison without the possibility of parole for Kim's murder.

## DISCUSSION

I. *The denial of appellant's motion to sever the charges against him*

Weber contends that the district court erred in denying his motion to sever the charges against him. We conclude that the charges were properly joined.

The decision to join or sever charges is within the discretion of the district court, and an appellant carries the heavy burden of showing that the court abused that discretion.[1] Error resulting from misjoinder of charges is harmless unless the improperly joined

---

[1]*Floyd v. State,* 118 Nev. 156, 164, 42 P.3d 249, 255 (2002); *see also Tabish v. State,* 119 Nev. 293, 302, 72 P.3d 584, 589-90 (2003).

charges had a substantial and injurious effect on the jury's verdict.[2] Even with charges that otherwise could be joined under NRS 173.115, a district court should order severance where joinder would cause unfair prejudice to the defendant.[3] Therefore, we must determine whether there was a proper basis to join the charges here and, if so, whether unfair prejudice still mandated severance.

### Basis for joinder

NRS 173.115 provides:

> Two or more offenses may be charged in the same indict-ment or information in a separate count for each offense if the offenses charged . . . are:
> 1.   Based on the same act or transaction; or
> 2.   Based on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

In this case, we are presented with the application of the language in subsection 2: "Based on two or more acts or transactions con-nected together or constituting parts of a common scheme or plan."

Weber concedes that the 17 felony counts for which he was in-dicted could be properly joined in three groups of charges, but he maintains that these groups should have been severed from each other. The three groups are: (1) the charges concerning his sexual misconduct and abuse of M. before April 4, 2002; (2) the charges concerning the murders of A. and Kim on April 4; and (3) the charges concerning his attack on C. and Froman on April 14. The sexual assault of M. on April 4, he argues, could have been joined as part of a common scheme or plan with either the first group of charges or the second, but not both.

Weber contends that the prior sexual misconduct and the mur-ders were not parts of a common scheme or plan. He also argues that the mere fact that the last sexual act with M. took place on the day of the murders does not create a common scheme or plan be-tween the first two groups. As to the third group, he contends that the events of April 14 were "born of the circumstances of the mo-ment; motivated by and done in response to events as they unfolded at that time," and shared no common scheme or plan with the April 4 offenses or the prior sexual misconduct.

We agree that, while joinder of charges within these three groups was justified because the offenses in each group shared a scheme

[2]*Tabish,* 119 Nev. at 302, 72 P.3d at 590.

[3]*See Floyd,* 118 Nev. at 164, 42 P.3d at 255; *see also* NRS 174.165(1).

or plan common to that group, no overarching scheme or plan common to the three groups was demonstrated.

Determining whether a common scheme or plan existed in this, or any, case requires fact-specific analysis. And such analysis depends on the meaning of the pertinent statutory language "scheme or plan." According to *Black's Law Dictionary*, a scheme is a "design or plan formed to accomplish some purpose; a system."[4] A plan is "a method of design or action, procedure, or arrangement for accomplishment of a particular act or object. Method of putting into effect an intention or proposal."[5] We conclude that these definitions pertain to "scheme or plan" as used in NRS 173.115(2). Thus, purposeful design is central to a scheme or plan,[6] though this does not mean that every scheme or plan must exhibit rigid consistency or coherency. We recognize that a person who forms and follows a scheme or plan may have to contend with contingencies, and therefore a scheme or plan can in practice reflect some flexibility and variation but still fall within an overall intended design. Nevertheless, we conclude that in this case the facts fail to show that Weber had a single scheme or plan that encompassed his ongoing sexual misconduct, his violence on April 4, and his violence on April 14.

The 17 felony counts charged offenses that spanned a period of about five years, beginning as early as 1997. Although there is no dispute that Weber's sexual misconduct and abuse of M. over this span of time evinced a common scheme, his crimes on April 4 and April 14, 2002, did not fall into this scheme, except perhaps the April 4 kidnap and sexual assault of M. Although these crimes emerged from the context of Weber's sexual misconduct, the State did not show that they composed part of his scheme of sexually exploiting M. Instead, the April 4 crimes reflect Weber's recognition that his scheme of surreptitious sexual abuse was unraveling.

Weber's attacks on C. and Froman on April 14 followed the murders of April 4, but the State did not show that the burglary and attacks actually shared a common scheme or plan with the murders. While the April 14 crimes occurred in the context of the preceding murders and sexual misconduct, Weber's attacks that day appear to be as much a response to discovery as a furtherance of a scheme or plan extending back to the earlier murders.

---

[4]*Black's Law Dictionary* 936 (abr. 6th ed. 1991).

[5]*Id.* at 796.

[6]This is consistent with our interpretation of "plan" as used in NRS 48.045(2). *See Richmond v. State,* 118 Nev. 924, 933-34, 59 P.3d 1249, 1255 (2002).

We conclude that the three groups of crimes did not constitute a common scheme or plan and joinder cannot be sustained on that ground. However, the question remains: were the three groups of acts nevertheless ''connected together'' under NRS 173.115(2)?

We have not addressed the ''connected together'' language in the statute, and it is a term that calls for more precise definition. We hold that for two charged crimes to be ''connected together'' under NRS 173.115(2), a court must determine that evidence of either crime would be admissible in a separate trial regarding the other crime. We have recognized this cross-admissibility as a basis for joinder of charges in some of our prior decisions.[7] We now expressly employ it to define ''connected together'' under NRS 173.115(2). We conclude that the groups of crimes charged and proven in this case are connected together because evidence of each group would have been relevant and admissible at separate trials of the other crimes.

Generally, evidence of other uncharged acts by a defendant are not admissible at trial. As NRS 48.045(2) provides: ''Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith.'' But the statute does provide that other-act evidence ''may . . . be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.'' To admit such evidence, we have held that it must be relevant, be proven by clear and convincing evidence, and have probative value that is not substantially outweighed by the risk of unfair prejudice.[8] In this case, the evidence for all the crimes was clear and convincing. We now turn to whether the evidence of one group of crimes would have been relevant at a separate trial regarding crimes in the other groups, and if so, whether joinder resulted in undue prejudice.

### Relevancy

We conclude that under NRS 48.045(2) evidence of Weber's various criminal acts would have been relevant in separate trials to prove his other crimes. It is evident that after sexually abusing M. for years, Weber murdered or attempted to murder those who appeared to threaten to end or expose this long-running abuse. Thus,

---

[7]*E.g., Honeycutt v. State,* 118 Nev. 660, 668, 56 P.3d 362, 367 (2002); *Floyd,* 118 Nev. at 163-64, 42 P.3d at 254-55.

[8]*Butler v. State,* 120 Nev. 879, 889, 102 P.3d 71, 78 (2004); *Tinch v. State,* 113 Nev. 1170, 1176, 946 P.2d 1061, 1064-65 (1997).

Weber's desire to continue and conceal that abuse or to punish those who were thwarting it provided the motive for the murders of M.'s brother and mother and the later attempted murder of her other brother and his guardian. Likewise, evidence of the murders and the attempted murders was probative of Weber's sexual abuse of M., showing his consciousness of guilt regarding the abuse and lack of consent by M. Furthermore, evidence that Weber attacked C. and Froman was probative as to the identity of the perpetrator of the earlier, unwitnessed murders of C.'s mother and brother at the same house, particularly given Weber's warning to Froman that he would "kill [C.] too." In turn, evidence of the earlier murders was relevant to show his intent on April 14 to kill C. and Froman as well as his consciousness of guilt and fugitive status in regard to the murders.

The State also argues that evidence of other acts would have been cross-admissible in separate trials to tell the "complete story" of charged crimes pursuant to NRS 48.035(3). We reject this argument. NRS 48.035(3) provides: "Evidence of another act or crime which is so closely related to . . . a crime charged that an ordinary witness cannot describe . . . the crime charged without referring to the other act or crime" is admissible, with a cautionary instruction if requested. This basis for admissibility is extremely narrow, as we have stated before[9] and as the plain language of the statute makes evident. First, the statute applies to testimony by an actual witness who cannot describe the charged crime without referring to another uncharged act; it does not contemplate a hypothetical witness or an abstract viewpoint from which two or more acts might be considered intertwined. The State has not shown how any specific witness in this case could not describe one group of crimes without referring to the others. Moreover, the statute refers to a witness's ability to "describe"—not "explain"— a charged crime. Thus, to the extent that the prosecution might want to introduce evidence of other acts to make sense of or provide a context for a charged crime, as opposed to simply introduce an account of events and conduct observed by a witness, NRS 48.035(3) is not a basis for admissibility.

*The question of unfair prejudice*

Finally, even if charges could otherwise be properly joined, severance may still be mandated where joinder would result in unfair prejudice to the defendant.[10] "To establish that joinder was

---

[9]*Tabish,* 119 Nev. at 307, 72 P.3d at 593.

[10]*See Floyd,* 118 Nev. at 164, 42 P.3d at 255; *see also* NRS 174.165(1).

[unfairly] prejudicial 'requires more than a mere showing that severance might have made acquittal more likely.' ''[11] Rather, the defendant carries the heavy burden of showing an abuse of discretion by the district court.[12]

We conclude that Weber fails to meet his burden of showing that he was unfairly prejudiced by the joinder of charges. The jury was properly instructed in regard to the multiple charges as follows: ''Each charge and the evidence pertaining to it should be considered separately. The fact that you may find a defendant guilty or not guilty as to one of the offenses charged should not control your verdict as to any other . . . offense charged.'' Weber has given us no reason to abandon the customary presumption that his jury followed this instruction.[13]

In addition, prejudice from joinder of charges requiring reversal is more likely in a close case because it may prevent jurors from making a reliable judgment about guilt.[14] Our review of the record shows that none of the charges against Weber presented a close case; on the contrary, the evidence was strong and conclusive in regard to all three groups of crimes. This is not an instance where due process was violated by combining charges in a weak case with charges in a strong case to help bolster the former.[15]

Weber nevertheless argues that joinder unfairly prejudiced him by preventing him from developing a theory of self-defense and testifying on his own behalf in regard to the attempted murder charges relating to his attack upon C. and Froman. Severance is not required simply because a defendant wishes to testify on one charge but remain silent on another.[16] Weber therefore has the burden to present sufficient information regarding the testimony he wished to give on the April 14 counts and his reasons for not testifying on the other counts to show this court that his claim of prejudice is genuine and to allow us to intelligently weigh his interest in testifying against considerations of judicial economy.[17] Weber has raised this claim in a perfunctory manner and fails to make such a showing.

[11]*Floyd,* 118 Nev. at 164, 42 P.3d at 255 (quoting *United States v. Wilson,* 715 F.2d 1164, 1171 (7th Cir. 1983)).

[12]*Id.*

[13]*See Collman v. State,* 116 Nev. 687, 722, 7 P.3d 426, 448 (2000).

[14]*Tabish,* 119 Nev. at 305, 72 P.3d at 591-92.

[15]*Cf. id.* at 305, 72 P.3d at 592.

[16]*Honeycutt,* 118 Nev. at 668, 56 P.3d at 367.

[17]*See id.* at 668, 56 P.3d at 367-68.

In sum, we conclude that the district court did not abuse its discretion by denying Weber's motion to sever.

## II. *The improper admission of hearsay evidence*

Weber contends that the district court improperly admitted hearsay testimony during trial. He objects to the following testimony by Robin Thornton, relating what Kim told Thornton on the day of Kim's murder.

> She had told me that a boy had called for [M.]; that T.J. had answered it and went crazy, cussed out the kid on the phone; proceeded to call M. names and call her a slut and racial gestures, to her going out with black guys.
>
> And M. told Kim. Kim was mad. She told T.J.: [M.] is going to be able to talk to boys and go out with boys. You are not her boyfriend; you're my boyfriend. You need to start acting like a father figure, if you're in her life, and not her boyfriend. . . .
>
> And she was going to drive her and her boyfriend to wherever they wanted to go on a date, the movies or—

Before this testimony was admitted, Weber objected citing the multiple layers of hearsay contained in the statement. The State maintained:

> It's our position they are not hearsay; we are not offering those statements for the truth of the matter. We are offering them specifically to show an effect on the hearer, the defendant. We are not offering those statements to prove that Kim was, in fact, going to allow M. to date; that she was, in fact going to facilitate the dating process. It is important . . . to show the defendant's mental state, to show how the defendant reacted to M. entering the dating process. So these statements are offered to show the effect they had on the defendant.

The district court agreed and ruled that Thornton's testimony was not hearsay because it was not being offered for the truth of the matter asserted. The court then instructed the jury that Thornton's testimony could only be used to show the effect of Kim's statements on Weber.

We conclude that Thornton's testimony contained inadmissible hearsay and should not have been admitted, but that the error does not warrant reversal.

Generally, hearsay is an out-of-court statement ''offered in evidence to prove the truth of the matter asserted.''[18] Hearsay is inad-

---

[18]NRS 51.035; *Franco v. State,* 109 Nev. 1229, 1236, 866 P.2d 247, 252 (1993).

missible unless it falls within one of several exceptions.[19] "Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms to an exception . . . ."[20] Hearsay evidence is traditionally excluded "because it is not subject to the usual tests to show the credibility of the declarant. Lacking is cross-examination to ascertain a declarant's perception, memory and truthfulness."[21]

The State and the district court's position—that Thornton's testimony simply related statements by Kim to Weber that were not offered for the truth of the matter asserted but only to show their effect upon Weber—fails to take into account the multiple levels of hearsay contained in that testimony. Thornton did not testify simply about a statement that Kim made directly to her. She testified also about earlier statements that, according to Kim, Kim made to Weber; Weber made to Kim, M., and M.'s friend; and M. made to Kim and Weber. Thornton herself had not been present for or heard any of these earlier statements. The district court's ruling failed to recognize that Thornton's testimony contained statements by three declarants—Weber, M., and Kim—involving as many as three levels of hearsay. The statements by each declarant require independent analysis to determine whether Thornton's testimony was properly admitted in whole or part.

The alleged statements furthest removed from Thornton's direct knowledge were Weber's initial remarks on the telephone to M.'s friend and his and M.'s remarks in the ensuing argument. Weber's remarks are statements by a party opponent, which are excepted from the hearsay rule.[22] The State argues on this basis that Thornton's reference to his remarks was proper, but the State disregards the three levels of hearsay present. The exception applies to the first level of hearsay, testimony by the direct percipient of the statements, in this case, M. But this exception does not extend to the successive layers of hearsay in Thornton's testimony.[23] Neither Kim nor Thornton heard Weber's remarks, so absent a basis for Kim to relate M.'s statement and a basis for Thornton to relate Kim's statement, the State could not introduce evidence of Weber's remarks by way of Thornton. The State has not proffered any such bases. No prejudice resulted, however, because evidence of Weber's remarks was properly introduced through M.'s testimony, which was subject to cross-examination by Weber.

---

[19]NRS 51.065(1); NRS 51.035; *Franco,* 109 Nev. at 1236, 866 P.2d at 252.

[20]NRS 51.067.

[21]*Deutscher v. State,* 95 Nev. 669, 684, 601 P.2d 407, 417 (1979).

[22]NRS 51.035(3)(a).

[23]*See* NRS 51.067.

Thornton also never heard the statements made by M.; she learned of them through Kim. Therefore, there must be a hearsay exception that applies to Kim's recounting to Thornton of M.'s remarks and another exception that applies to Thornton's testimony about that recounting. On appeal, the State argues that it was not concerned with the truth of M.'s statements, only their effect on Kim. The State also argues that M.'s statements were admissible as excited utterances. Even assuming this is so, it is only a basis for Kim, not Thornton, to testify about the remarks. Again, however, no prejudice is discernible because M. testified, subject to cross-examination, that she told her mother about her dispute with Weber and that as a consequence Kim confronted Weber and the two quarreled.

Finally, we consider Kim's own statements, apart from any references to M.'s and Weber's remarks. But there are still two levels of hearsay to Kim's own statements because in speaking to Thornton she also related earlier statements she allegedly made to Weber—such as, she was going to drive M. and her boyfriend on dates. Thornton did not hear those earlier statements directly, so a hearsay exception is necessary for Kim to relate them to Thornton and another is necessary for Thornton to testify about them.

As noted above, the State maintains and the district court agreed that these statements by Kim to Weber were not being offered for the truth of the matter asserted but only to show the effect of the statements upon Weber. It is true that the hearsay rule does not exclude a statement "merely offered to show that the statement was made and the listener was affected by the statement."[24] But this exception applies only to Kim's statements to Weber, not to her later statement to Thornton. That is, under this exception, Kim could have testified about her own out-of-court statements to Weber to help the State prove that he heard and reacted to the statements, not to prove the truth of the matter asserted, *e.g.,* that Kim truly intended to drive M. on dates.

But Kim's statements to Thornton about what Kim told Weber were being offered for the truth of the matter asserted, that is, Kim actually made earlier statements to Weber. In order for the jurors to evaluate the effect of Kim's statements upon Weber, the jurors had to accept as true that Kim had made those statements. Thornton could not testify—and be cross-examined—on that crucial matter because she had no direct knowledge of it. Kim's statement that

---

[24]*Wallach v. State,* 106 Nev. 470, 473, 796 P.2d 224, 227 (1990).

she talked to Weber is inadmissible hearsay. But we conclude that any prejudice resulting from its admission was minimal because the same evidence was introduced through M.'s testimony. Although M. did not testify to the specific statements Kim made to Weber, she was able to testify that Kim confronted Weber and quarreled with him about his treatment of M.

Thornton's testimony also had a single level of hearsay in regard to Kim's statements that did not involve references to earlier statements by Weber, M., or Kim herself. It appears that Kim told Thornton directly that she was "mad" about Weber's dealings with M. and that she intended to drive M. on dates. We conclude that these statements reflected Kim's state of mind just before her murder and were relevant to the State's theory of why Weber murdered Kim. They were therefore admissible under NRS 51.105(1), which provides: "A statement of the declarant's then existing state of mind, emotion, sensation or physical condition, such as intent, plan, motive, design, mental feeling, pain and bodily health, is not inadmissible under the hearsay rule."

In sum, the testimony by Thornton at issue comprised largely inadmissible hearsay evidence.[25] When testimony has been improperly admitted in violation of the hearsay rule, we must determine whether the error was harmless beyond a reasonable doubt:[26] "Evidence against the defendant must be substantial enough to convict him in an otherwise fair trial, and it must be said without reservation that the verdict would have been the same in the absence of error."[27] We conclude without reservation that even if Thornton's hearsay testimony had been excluded the verdict here would have been the same.

First, most of the evidence provided by Thornton was also provided to the jury by M.'s testimony. Second, M.'s remaining testimony, the images of M. found on Weber's computer, the forensic evidence recovered from the house, and the testimony of C. and Froman constitute overwhelming independent evidence of Weber's guilt. Therefore, even without Thornton's hearsay testimony, the jury would have had ample evidence to convict Weber and to show that on April 3 and 4, 2002, Weber believed that his ongoing sex-

---

[25]Because we conclude that much of the testimony was inadmissible, we do not address whether the admission of the testimony violated the Confrontation Clause. *See* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . .").

[26]*See Franco,* 109 Nev. at 1237, 866 P.2d at 252; *see also United States v. Nielsen,* 371 F.3d 574, 581 (9th Cir. 2004).

[27]*Homick v. State,* 112 Nev. 304, 316, 913 P.2d 1280, 1288 (1996).

ual abuse of M. was threatened and supporting the inference that this belief motivated his subsequent crimes.

### III. *The improper denial of appellant's challenges of prospective jurors for cause*

Weber contends that the district court erroneously denied his challenges to two members of the venire for cause, depriving him of his right to a fair trial. We conclude that the district court erred but that Weber has not demonstrated any resulting prejudice.

District courts have "broad discretion" in deciding whether to remove prospective jurors for cause.[28] The test for evaluating whether a juror should have been removed for cause is "whether a prospective juror's views 'would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' "[29] Here, Weber contends that prospective jurors number 40 and number 127 should have been removed under this standard.

The record shows that prospective juror number 40 repeatedly expressed doubt that she could fairly consider all four penalty options, in the event of a first-degree murder conviction, and even indicated that she could not consider a penalty that allowed parole for a person found guilty of the crimes with which Weber was charged. She also expressed her belief that the death penalty was imposed too humanely and that a murderer should suffer as the victim suffered. Although in response to questions by the prosecutor she stated that she could consider all four penalty options, she did not maintain that position when questioned again by defense counsel. When the district court described her as "flip flopping" and complained, "I don't know where you stand," the prospective juror said, "I guess it's the way the questions are put." Nevertheless, the court denied Weber's challenge for cause, and eventually he used a peremptory challenge to excuse the prospective juror.

Prospective juror number 127 expressed preconceived opinions about the strength of the State's case and Weber's likely guilt, acknowledging that he had learned of the case in the media. His remarks showed that he did not fully accept the burden of proof that the State had to meet to overcome Weber's presumption of innocence. The prospective juror stated, for example: "The judge has presented, theoretically, you [the defense] don't have to say any-

---

[28]*Leonard v. State,* 117 Nev. 53, 67, 17 P.3d 397, 406 (2001); *cf.* NRS 16.060.

[29]*Leonard,* 117 Nev. at 65, 17 P.3d at 405 (quoting *Wainwright v. Witt,* 469 U.S. 412, 424 (1985) (internal quotation omitted)); *see also* NRS 16.050; NRS 175.036.

thing. Realistically, I feel you do to discredit—.'' The district court admonished the prospective juror, "You can't judge a case by how many witnesses a side puts on," and the prosecutor attempted to rehabilitate the prospective juror through some hypothetical questions. The district court then denied Weber's challenge for cause, and Weber excused the prospective juror with a peremptory challenge.

We conclude that the district court erred in denying Weber's challenges to these prospective jurors. Neither was able to state without reservation that she or he had relinquished views previously expressed which were at odds with their duty as impartial jurors. Detached language considered alone is not sufficient to establish that a juror can be fair when the juror's declaration as a whole indicates that she could not state unequivocally that a preconception would not influence her verdict.[30]

Weber claims that his right to due process was violated, but he has not shown that he was prejudiced by the district court's error. Weber was able to remove both prospective jurors with peremptory challenges. Although he appears to have exhausted his peremptory challenges during voir dire, he does not allege or demonstrate that any jurors actually empanelled were not fair and impartial. Any claim of constitutional significance must focus on the jurors who were actually seated, not on excused jurors. Because Weber does not establish that any of the jurors who sat in judgment against him were not fair and impartial, his claim warrants no relief.[31]

## IV. *The jury instruction on flight*

Weber contends that the jury was erroneously instructed on flight in regard to his actions after the April 2002 crimes. He moved unsuccessfully to strike the instruction. We conclude that his contention has no merit.

A jury may properly receive an instruction regarding a defendant's flight so long as it is supported by the evidence.[32] We have

---

[30]*See Thompson v. State,* 111 Nev. 439, 442, 894 P.2d 375, 377 (1995).

[31]*See Ross v. Oklahoma,* 487 U.S. 81, 88-89 (1988); *Wesley v. State,* 112 Nev. 503, 511, 916 P.2d 793, 799 (1996); *Thompson v. State,* 102 Nev. 348, 350, 721 P.2d 1290, 1291 (1986) ("[A]ppellant has not demonstrated that any other jurors proved unacceptable and would have been excused had an additional peremptory challenge been available.").

[32]*Potter v. State,* 96 Nev. 875, 875-76, 619 P.2d 1222, 1222 (1980); *McGuire v. State,* 86 Nev. 262, 266, 468 P.2d 12, 15 (1970).

cautioned that flight "signifies something more than a mere going away. It embodies the idea of going away with a consciousness of guilt, for the purpose of avoiding arrest."[33] Because of the possibility of undue influence by such an instruction, this court carefully scrutinizes the record to determine if the evidence actually warranted the instruction.[34]

Here, jury instruction number 51 provided:

> The flight of a person immediately after the commission of a crime is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding the question of his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine.

This instruction itself is appropriate.[35] But Weber asserts that incompetence on the part of the police delayed his arrest—not any attempt on his part to flee. There is ample evidence to the contrary.

The State showed that Weber abandoned his car at a casino parking lot on the day of the murders and left Las Vegas on a bus. Over the next week, he traveled to California, Oregon, Washington, Idaho, and Utah. He purchased a fake moustache while in Seattle. Weber returned to Las Vegas sometime on April 12 and broke a police seal and entered his and Kim's home. Two days later he attacked C. and Froman and immediately disappeared again until he was arrested two weeks later, hiding out in a trailer. Given this evidence, Weber's behavior after the crimes constituted more than a mere going away, and it was proper to instruct the jury regarding flight.

## V. *The denial of appellant's motion to suppress and the adequacy of the search warrants permitting the seizure of evidence from his computer*

Weber maintains that the district court improperly denied his motion to suppress the evidence of child pornography seized from his computer. He contends that two search warrants authorizing the computer search were constitutionally defective because they were based on unsupported and misleading probable cause statements. At the very least, Weber maintains that the district court was required to hold a hearing on his motion before denying it. We conclude that this claim is without merit.

---

[33]*State v. Rothrock,* 45 Nev. 214, 229, 200 P. 525, 529 (1921).

[34]*Miles v. State,* 97 Nev. 82, 85, 624 P.2d 494, 496 (1981).

[35]*See id.* at 84-85 & n.1, 624 P.2d at 495-96 & n.1 (concluding that no error occurred in giving an identical instruction).

The Nevada Constitution and the United States Constitution require all government searches to be reasonable and all warrants to be based on probable cause.[36] "[N]o warrant shall issue but on probable cause, supported by Oath or Affirmation, particularly describing the place or places to be searched, and the person or persons, and thing or things to be seized."[37] Probable cause requires "trustworthy facts and circumstances which would cause a person of reasonable caution to believe that it is more likely than not that the specific items to be searched for" are subject to seizure and at the place to be searched.[38] This court will not overturn a probable cause finding "unless the evidence in its entirety provides no substantial basis for the magistrate's finding."[39]

The first warrant in question was prepared by and based upon an affidavit by LVMPD Detective Sherwood and permitted search of "any computer(s) or computer-related storage media," as well as paperwork and credit card records in Weber's name in his home, that could be associated with false identification. District Judge Nancy Saitta issued the warrant on April 8, 2002. Detective Sherwood's affidavit in support of probable cause stated in part:

> It was learned through the investigation that the computer in the living[ ]room area was the computer that was used by Weber. It was also learned that Weber is very computer literate. It is known by your affiant that persons that have computers and fixations with children may access web sites that are pornographic in nature. It is also common for these types of persons to send electronic mail or be involved in "Chat Groups" regarding child pornography.
>
> LVMPD Homicide Detectives also received information that Weber utilizes the computer to produce and manufacture false identities that would [aid] and abet in his efforts to evade capture. Weber has been known by his associates to use false identification in the past.

Detective Sherwood's affidavit was based upon statements made by M. and by Kim's friend Robin Thornton. During an interview with LVMPD investigators on April 8, M. told them that Weber "could make a fake I.D." and had "at least like twelve or thir-

---

[36]Nev. Const. art. 1, § 18; U.S. Const. amend. IV.

[37]Nev. Const. art. 1, § 18.

[38]*Keesee v. State,* 110 Nev. 997, 1002, 879 P.2d 63, 66 (1994); *see also Illinois v. Gates,* 462 U.S. 213, 238-39 (1983); *U.S. v. Collins,* 61 F.3d 1379, 1384 (9th Cir. 1995).

[39]*Garrettson v. State,* 114 Nev. 1064, 1068-69, 967 P.2d 428, 431 (1998).

teen'' credit cards in his name. That same day, Thornton told investigators that Weber and Kim had used fraudulent credit cards extensively in the past, that Weber was very computer literate, and that he made a lot of money with a ''scam'' over the Internet on his computer.

Given these two statements and Detective Sherwood's own statements of professional knowledge and experience,[40] the detective's affidavit provided a substantial basis for the district judge's initial finding of probable cause to search the computer.

Pursuant to that first warrant, LVMPD Forensic Investigator Larry Smith searched Weber's computer on April 18. When he discovered several depictions of what he believed was child pornography, including photos of M., Investigator Smith ceased his search and wrote an affidavit for an additional warrant to continue the search to specifically look for child pornography and related materials. District Judge Valorie Vega signed this warrant on April 23, and the search resumed. Based on Investigator Smith's discovery of child pornography during his initial computer search, probable cause existed for this second warrant.

Weber maintains that the district court was required to hold an evidentiary hearing on his motion to suppress before deciding it. We have held that ''a defendant is not entitled to an evidentiary hearing [under *Franks v. Delaware*[41]] to examine the validity of a search warrant unless he or she can make a preliminary showing and an offer of proof that there were intentional or reckless material falsehoods in the affidavit.''[42] Here, even assuming the two warrants were based on defective probable cause, Weber has failed to make even a minimal showing of bad faith, intentional or reckless material falsehoods on the part of the investigators. Thus, Weber was not entitled to a *Franks* hearing on his motion challenging the warrants' validity. The district court properly denied Weber's motion without an evidentiary hearing.

## VI. *Other issues*

Weber argues that his penalty hearing should have been bifurcated. We have rejected this argument before, most recently in *McConnell v. State*.[43] We decline to reconsider the issue.

---

[40]*See generally U.S. v. Gil,* 58 F.3d 1414, 1418 (9th Cir. 1995) (stating that judges may rely upon the training and experience of affiant law enforcement officers in determining probable cause).

[41]438 U.S. 154 (1978).

[42]*Garrettson,* 114 Nev. at 1068, 967 P.2d at 430.

[43]120 Nev. 1043, 1061-62, 102 P.3d 606, 619 (2004).

Weber also claims that he had a right to argue last to the jury during his penalty hearing and the district court improperly denied his motion to do so. This claim has no merit. As we have repeatedly explained, NRS 175.141(5) requires that counsel for the State open and conclude argument.[44]

Weber contends that the State's notice of intent to seek the death penalty was flawed because Nevada's death penalty sentencing scheme is unconstitutional. The district court denied his motion to strike the notice. Weber argues that the death penalty scheme is unconstitutional because it fails to narrow the class of death-eligible defendants, fails to require a probable cause finding to support the State's alleged aggravating circumstances, fails to protect the innocent, permits relaxed evidentiary standards, fails to require the jury to identify all mitigating circumstances considered during deliberations, allows cruel and unusual punishment, and violates international law. Weber's arguments do not persuade us to revisit our prior determinations that the death penalty scheme is constitutional.[45]

## VII. *Mandatory review of the death sentence*

This court is required pursuant to NRS 177.055(2) to review every death sentence and consider the following three questions:

> (c) Whether the evidence supports the finding of an aggravating circumstance or circumstances;
>
> (d) Whether the sentence of death was imposed under the influence of passion, prejudice or any arbitrary factor; and
>
> (e) Whether the sentence of death is excessive, considering both the crime and the defendant.

*Whether the evidence supported the aggravating circumstances*

We conclude that the evidence supported the finding of the 13 aggravating circumstances in this case.

Aggravators one through eight were based on NRS 200.033(2), which provides in part that first-degree murder is aggravated when it was committed by a person who has been convicted of a felony ''involving the use or threat of violence.'' Weber argues that only a single aggravating circumstance can be based upon this subsec-

---

[44]*E.g., Hernandez v. State,* 118 Nev. 513, 534, 50 P.3d 1100, 1114 (2002).

[45]*See, e.g., Leonard,* 117 Nev. at 82-83, 17 P.3d at 415-16; *Gallego v. State,* 117 Nev. 348, 370, 23 P.3d 227, 242 (2001); *see also Vanisi v. State,* 117 Nev. 330, 344, 22 P.3d 1164, 1173-74 (2001) (holding that jurors are not required to specify what mitigating circumstances they have found); *United States v. Mechanik,* 475 U.S. 66, 70 (1986) (where defendants were convicted

tion, but we have previously rejected this argument.[46] The eight aggravators here were founded on felonies found by the jury after the guilt phase of Weber's trial: (1) the sexual assault of M. between January 1, 1997, and December 1, 1998; (2) and (3) the sexual assaults of M. between January 1, 2000, and April 3, 2002; (4) the first-degree kidnapping of M. on April 4, 2002; (5) the sexual assault on M. on April 4; (6) the first-degree kidnapping of A. on April 4; (7) the attempted murder of C. on April 14; and (8) the attempted murder of Froman on April 14. We conclude that the record shows that Weber used or threatened violence during the commission of these felonies, but the evidence relating to aggravators two and three warrants some discussion.

Although the use or threat of violence often occurs in sexual assault, neither is a necessary element of the offense.[47] The record here reflects no evidence of overt violence or overt threats of violence by Weber against M. during the two sexual assault convictions that occurred between January 1, 2000, and April 3, 2002. However, the record does show that M. experienced trauma and violence during Weber's first sexual assault on her in 1997 or 1998. At that time, M. was in elementary school and prepubescent, and she bled and screamed. Weber told M. to keep it secret. Further, Weber's sexual assaults occurred against M.'s will. Weber was much superior to M. in physical strength, as well as older. He was also convicted of destroying property for kicking in the front door of Kim's home in May 2000. For years M. did not tell anyone— initially not even investigators—about Weber's sexual abuse of her because she was scared. Finally, deadly violence by Weber against M.'s family materialized on April 4, 2002. We conclude that the totality of this evidence was sufficient for a reasonable jury to infer that the two sexual assaults in question included at least implicit threats of violence, allowing their use as valid aggravators in this case.[48]

---

after trial beyond a reasonable doubt, probable cause undoubtedly existed to bind them over for trial, so any error in the grand jury proceedings connected to the charging decision was harmless beyond a reasonable doubt); *People v. Hillhouse,* 40 P.3d 754, 782 (Cal. 2002) (rejecting a claim that the United States is bound by the International Convention Against All Forms of Racial Discrimination in death penalty cases).

[46]*See Riley v. State,* 107 Nev. 205, 216-17, 808 P.2d 551, 557-58 (1991).

[47]*See* NRS 200.366(1); *McNair v. State,* 108 Nev. 53, 57, 825 P.2d 571, 574 (1992) ("Physical force is not a necessary element in the commission of the crime of rape.").

[48]*See Randolph v. State,* 117 Nev. 970, 984, 36 P.3d 424, 433 (2001) (it is permissible for the jurors "to draw reasonable inferences from the evidence"); *cf. Collman,* 116 Nev. at 711, 7 P.3d at 441 ("Circumstantial evidence alone may support a judgment of conviction.").

Aggravators nine through eleven were based on NRS 200.033(4), which provides in relevant part that first-degree murder is aggravated when it was committed while the person was engaged in "burglary, invasion of the home or kidnapping in the first degree, and the person charged . . . [k]illed or attempted to kill the person murdered." Weber contends that this aggravator is invalid because it makes "every felony murder situation eligible for the death penalty." In our recent decision in *McConnell,* we held that "a felony may not be used both to establish first-degree murder and to aggravate the murder to capital status."[49] Because Weber was convicted of deliberate, premeditated murder and/or murder by torture, not felony murder, our holding in *McConnell* is not implicated. We conclude that the evidence supported finding that Weber killed A. and committed the murder during his burglary of his and Kim's home, during his kidnapping of M., and during his kidnapping of A.

Aggravator twelve was based on NRS 200.033(8), which provides that first-degree murder is aggravated when it involved torture of the victim. Torture "requires that the murderer must have intended to inflict pain beyond the killing itself."[50] "Torture involves a calculated intent to inflict pain for revenge, extortion, persuasion or for any sadistic purpose."[51] Here, evidence showed that Weber not only killed A. by suffocation, but that he bound his hands and legs together with layers of duct tape, placed weights on him, duct-taped his eyes and mouth shut, but left his nostrils open while a black plastic bag was placed over his head. The autopsy of A.'s body revealed that he bled and vomited through his nostrils, struggled to free himself, and suffered a slow death. This evidence shows that Weber acted in a calculated and sadistic manner that caused A. great pain beyond the killing itself.

Aggravator thirteen was based on NRS 200.033(12): "The defendant has, in the immediate proceeding, been convicted of more than one offense of murder . . . ." The evidence supported this aggravator because Weber was convicted of the murders of both Kim and A.

---

[49]120 Nev. at 1073, 102 P.3d at 627.

[50]*Domingues v. State,* 112 Nev. 683, 702, 917 P.2d 1364, 1377 (1996).

[51]*Id.* at 702 n.6, 917 P.2d at 1377 n.6.

*Whether the death sentence was imposed under any improper influence or was excessive*

We see no indication that Weber's death sentence was imposed under the influence of passion, prejudice, or any arbitrary factor. On the contrary, the record shows that Weber had a discerning jury that distinguished Kim's murder from A.'s, choosing to impose death only for the latter. A. was a young teenager, lured by Weber to his death with the promise of money from his mother. And the death A. suffered was particularly slow and agonizing. These are only two of the objective factors the jury could have considered in distinguishing between the murders.

Additionally, solid circumstantial and direct evidence supported Weber's convictions and aggravating conduct, including pornographic photos of his own misconduct with M., DNA evidence proving his sexual abuse of M., finger and palm prints found on duct tape and plastic bags linking him to the murders of A. and Kim, and the testimony of many witnesses. While the facts of this case certainly involve emotions, the record does not show the jury acted under any improper influence.

Finally, considering both Weber and his crime, we conclude that his sentence of death is not excessive. Without any reasonable provocation, Weber murdered A., a 15-year-old boy who trusted him. A. was a typical teenage boy who liked girls, skateboarding, and video games; his murder was untimely, senseless, and brutal. Weber also destroyed a family, murdering the mother of three children after sexually abusing the young daughter over a five-year period. Exacerbating these crimes was his attempt to murder 17-year-old C. and Froman on the day of A. and Kim's funeral. Given the appalling nature and circumstances of A.'s murder and Weber's character as revealed by all his crimes, death is not an excessive sentence for Weber.

## CONCLUSION

We affirm Weber's judgment of conviction and sentence of death.

MAUPIN, GIBBONS, DOUGLAS and PARRAGUIRRE, JJ., concur.

ROSE, J., with whom HARDESTY, J., agrees, concurring:

I agree with the analysis in the majority opinion on all issues, except two. First, I disagree with its conclusion that it was proper to join the counts stemming from the events of April 14 with the other counts. The reasons given for why the April 14 incident is admissible at the trial of the sexual assault/murder counts are generally unconvincing to me, and the counts relating to the April 14 incident should have been tried separately. But since the statement

Weber made on April 14 would have been admissible at the trial of the other charges to show consciousness of guilt and as an admission against interest, the error of joinder was harmless because the jury would have received some information about the subsequent conflict and none of the counts presented a close case of guilt.[1]

Second, I would like to give a narrower definition to the term ''connected together'' by including considerations of whether the two crimes are truly related to each other and the prejudice caused the defendant by joinder, as well as whether evidence of the crimes is clearly cross-admissible.[2] My concern with adopting the standard of cross-admissibility is that it may present little restriction on the wholesale joining of numerous disparate criminal acts together for trial. When we look at the admissibility of prior bad acts in a criminal trial, a form of cross-admissibility that is governed by statute, we see that the standard has become a very expansive one.

NRS 48.045 states that character evidence, usually in the form of prior bad acts evidence, is inadmissible to prove conduct but that prior bad acts are admissible for other purposes such as proving motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident. It is a general rule, with lots of exceptions. Our jurisprudence starts off well enough by declaring that the admission of prior bad or criminal acts at trial is disfavored and should be strictly limited.

> We have often held that the use of uncharged bad act evidence to convict a defendant is heavily disfavored in our criminal justice system because bad acts are often irrelevant and prejudicial and force the accused to defend against vague and unsubstantiated charges. The principal concern with admitting such acts is that the jury will be unduly influenced by the evidence, and thus convict the accused because it believes the accused is a bad person.[3]

In practice, however, we have seen a broad interpretation of the exceptions contained in NRS 48.045, with the prosecution continually offering prior bad acts committed by a defendant. And too often, the district courts are willing to permit the admission of prior bad act evidence. Once admitted, the district court's decision is cloaked with the presumption of propriety and will not be disturbed unless it is manifestly wrong.[4] The end result is that this court usually affirms the introduction of prior bad act evidence,

---

[1]*See Tabish v. State,* 119 Nev. 293, 307-09, 72 P.3d 584, 593-94 (2003).

[2]NRS 173.115(2).

[3]*Tavares v. State,* 117 Nev. 725, 730, 30 P.3d 1128, 1131 (2001) (footnote omitted).

[4]*Gallego v. State,* 101 Nev. 782, 789, 711 P.2d 856, 861 (1985); *Brinkley v. State,* 101 Nev. 676, 679-80, 708 P.2d 1026, 1028-29 (1985).

even when its admissibility may seem marginal,[5] or when the prior bad act is remote in time.[6]

Our recent decision in *Tabish v. State*[7] is a good example of this point and the close relationship between NRS 48.045 and cross-admissibility. Tabish and a codefendant were charged with the robbery and murder of Ted Binion, and included in the information were counts against Tabish alleging the kidnapping, beating, and extortion of a Leo Casey that happened two months earlier. The district court refused to sever the counts, and one issue on appeal was whether the district court erred in not severing the Casey counts from the Binion counts. Although the only defendant involved in both crimes was Tabish, the prosecutor argued that the evidence contained in the Casey counts was admissible under NRS 48.045 at the murder trial to show motive, plan, and identity. We concluded that although the Casey counts arguably had some relevance to the murder charges, this evidence was far more prejudicial than probative, and therefore the district court committed reversible error in not severing the counts for trial.[8] In my view, this case demonstrates that a prior bad act should have more than arguable relevance to the later crime before it is deemed cross-admissible and that the prejudicial impact that joinder has on a defendant should be seriously considered, as was done in *Tabish*.

I am hopeful that the district courts will be reluctant to join unrelated criminal acts for trial unless it is shown that the evidence of both crimes is clearly cross-admissible, that the two criminal incidents appear to be closely connected together, and that no substantial prejudice will occur to the defendant.

---

[5]*See Honeycutt v. State,* 118 Nev. 660, 672-73, 56 P.3d 362, 370 (2002) (affirming the district court's decision admitting evidence of a prior, unrelated sexual assault).

[6]*Bolin v. State,* 114 Nev. 503, 517-21, 960 P.2d 784, 793-96 (1998).

[7]119 Nev. 293, 72 P.3d 584.

[8]*Id.* at 308-09, 72 P.3d at 593-94.