*899 OPINION

Per Curiam:

After the dead body of Suzette Ceci (“Suzette”) was discovered in the desert, a police investigation led to appellant Jamie Cunningham (“Cunningham”) as Suzette’s murderer. Cunningham was convicted of second degree murder with use of a deadly weapon and sentenced to life without the possibility of parole as a habitual criminal pursuant to NRS 207.010.
On appeal, Cunningham first argues that a photographic lineup identification by a highway patrolman who witnessed him driving Suzette’s car one week after her disappearance was unduly suggestive and should have been excluded. Second, Cunningham argues that a statement made by Suzette’s friend to Suzette’s husband should not have been admitted because it was hearsay. *900 Third, Cunningham argues that a letter written to the police by a fellow inmate, revealing Cunningham’s alleged confession, should have been excluded as hearsay. Next, Cunningham contends that certain statements made by the prosecutor during closing arguments amounted to prosecutorial misconduct requiring reversal of his conviction. Finally, Cunningham alleges that the evidence submitted at trial was insufficient to support his conviction.
We conclude Cunningham’s contentions are without merit and affirm the conviction.

FACTS

On August 17, 1992, at 12:30 p.m., Tom Ceci (“Tom”) arrived home from work to see his wife, Suzette, after she called Tom’s business partner to accuse Tom of embezzling funds from the business. He found Suzette on their bed in a fetal position, displaying symptoms of crack cocaine withdrawal.
One hour later, at 1:30 p.m., Cunningham, who was Suzette’s friend, arrived at the Ceci apartment. By that time, Suzette had become violent and hysterical.[1] Cunningham showed Tom his gun which he had allegedly brought to the apartment, and said, “Do you want me to take her out to the desert?” Tom thought he was joking and refused.
At 6:00 p.m., after Suzette calmed down, she and Cunningham left the apartment in Suzette’s car. They went to the house of Cunningham’s brother because Suzette wanted to sell him some personal items.
At 9:30 p.m., Cunningham arrived back at the Ceci apartment without Suzette. He told Tom that Suzette “freaked out” and left his brother’s house in her car. Cunningham told Tom that he did not know where Suzette was.
On August 20, 1992, a dead female body was found in the desert four miles southwest of Las Vegas. Her hands were tied and she was stabbed fifteen times.
On August 24, 1992, at 10:30 p.m., Nevada Highway Patrol Officer Christopher Perry (“Perry”) was stopped at a red light when he noticed that the car in the left lane, next to him, was stopped several feet back from the light. Perry turned around to look at the driver through the windshield. When the light turned green, Perry waited until the car passed him. At the next red light, the same thing happened and Perry again looked back at the driver’s face. Then the driver of the car made an illegal right turn from the left lane in front of Perry’s patrol car. Perry attempted to *901 conduct a traffic stop, but the driver refused to stop. A chase ensued. The car eventually crashed into a chain-link fence, and the driver exited the vehicle and ran away. Perry was unable to capture the driver. In his report, Perry described the driver as a white man with collar-length curly hair.
The car was registered to Suzette and was the same car that Tom last saw her in on August 17, 1992. After Perry identified the car, he went to Tom’s apartment late that night. Tom told Perry that Suzette had been missing for about a week, but he thought she was just trying to get sober. Perry suggested that Tom file a missing person’s report, which Tom did the next day, August 25, 1992, after picking up the car from the impound lot.
Based on suspicions that the car and the body found in the desert were related, on August 26, 1992, Homicide Detective Roy Chandler (“Chandler”) re-impounded Suzette’s car to search for evidence. On August 27, 1992, the body was positively identified as Suzette through dental records.
In January 1993, Chandler called Perry for a photographic lineup to identify the driver of Suzette’s car on August 24, 1992. Although Perry had previously identified the driver as white, Chandler asked Perry if it were possible that the man was, in fact, a light-skinned black man. Perry answered that it was possible. Pursuant to this conversation, Chandler put together a photo lineup of three white men and three light-skinned black or his-panic men.
On January 11, 1993, Chandler presented Perry with the photo lineup. On the back of the display was a pre-printed message stating that hair length and facial hair can easily change. Chandler repeated this message to Perry, as required by the photographic identification guidelines, and left the room. Perry immediately identified Cunningham, a light-skinned black man, as the driver of Suzette’s car. Cunningham’s was the only photograph displaying short hair, while the other five photo subjects had longer length hair.
In May 1993, Cunningham was arrested for murdering Suzette. On December 6, 1993, a preliminary hearing was held, and on December 17, 1993, an information was filed. On August 10, 1994, pursuant to Cunningham’s motion to exclude the photographic lineup identification, an evidentiary hearing was conducted. Upon considering the testimony of Chandler and Perry, the district court denied the motion.
The trial commenced one year later on August 15, 1995, and concluded August 23, 1995. At trial, respondent State of Nevada (“the State”) presented the testimony of three people to whom Cunningham allegedly confessed murdering Suzette. Tim Bradley (“Bradley”) had a taped conversation with Chandler on *902 March 17, 1993. Because Bradley was uncooperative on the stand, portions of the March 17, 1993 conversation were read at trial. This information revealed that Cunningham told Bradley that he was involved in a high speed chase with the Nevada Highway Patrol and he ran from the car. He also allegedly told Bradley that he killed Suzette “because she was tripping” and that “she had to go.”
Stanley Wright (“Wright”) was incarcerated with Cunningham in 1993 after Cunningham was arrested for the current charge. Cunningham allegedly told Wright, in the presence of a man known only as “Oldtimer,”[2] that he stabbed Suzette and put her body in the desert. Oldtimer took notes of this conversation (hereinafter “the Oldtimer letter”) and sent them to Chandler. On June 10, 1993, Chandler had a taped conversation with Wright about the information in the Oldtimer letter. Chandler also requested that Wright sign the Oldtimer letter if it accurately ■reflected Wright’s memory of his dialogue with Cunningham. Wright signéd the top of the letter.
Because Wright was uncooperative on the stand, portions of his conversation with Chandler were read at trial, specifically:
Q. Were you asked this question:
“Q. How did he [Cunningham] tell you that he killed her [Suzette]?”
And did you give this answer:
“A. He told me that they were going and riding around in her car, and she had so much money on her, and she wanted some crack. And he’s a crack head. So what he did, he took the money and he sold her the dope and he went down by Jean towards California, stabbed her and put her in the desert.”
(Emphasis added.) In addition, over defense counsel’s hearsay objection, the Oldtimer letter was admitted as an adoptive statement by Wright.
Steve Patzig (“Patzig”), who had been incarcerated with Cunningham in June 1994,[3] testified that Cunningham told him about Suzette and Tom and that he had killed Suzette.
Also at trial, Tom testified that when he was initially looking for Suzette, her friend, known only as “Nelson,” told Tom that he saw her at the house of Cunningham’s brother on August 20, *903 1992. This statement was admitted over defense counsel’s hearsay objection.
The jury instructions required the jury to decide whether Cunningham was guilty of first degree murder with or without a deadly weapon, second degree murder with or without a deadly weapon, or not guilty. On August 23, 1995, the jury returned a verdict of second degree murder with use of a deadly weapon. On October 18, 1995, Cunningham was sentenced as a habitual criminal to life in prison without the possibility of parole. On October 20, 1995, Cunningham filed his notice of appeal.

DISCUSSION

The photographic lineup identification

Cunningham argues that Perry’s identification at the photographic lineup conducted by Chandler should have been suppressed because it was overly suggestive. He asserts that when Chandler asked Perry a week before the lineup if the driver of Suzette’s car could have been a light-colored black man, Chandler was suggesting that the suspect was black and not white.[4]
Further, shortly before presenting the photographs, Chandler told Perry that hair length can change. Cunningham avers that this was suggestive because Cunningham’s picture was the only one portraying short hair.[5]
Perry testified at the August 10, 1995 evidentiary hearing and at trial that he chose Cunningham based on his facial features and not his race or hair length. Perry further testified that he had no doubt that Cunningham was the driver of Suzette’s car on August 24, 1992.
Based on Perry’s and Chandler’s testimony at the hearing, the district court denied Cunningham’s motion to suppress the photographic identification. Specifically, the judge stated,
[Tjaking into account all the attendant circumstances surrounding this lineup that it can be concluded fairly that it was objectively given and the selection was fairly made. . . . [Wje’re making too much out of a little matter here.
*904 Simmons v. United States, 390 U.S. 377, 383 (1967), requires a court to consider the totality of surrounding circumstances as to whether a photographic identification procedure was “so unduly prejudicial as to fatally taint [the defendant’s] conviction.” Simmons held a photographic identification must be set aside “only if the photographic identification procedure was so imper-missibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.” Id. at 384.
In the present case, after a review of the photograph array in the record, we conclude that the district court did not err by admitting Perry’s photographic lineup identification of Cunningham. The facts indicate that Perry did not identify Cunningham based on any statements made by Chandler. We further conclude that Chandler did not unduly suggest to Perry that Cunningham was the suspect Chandler had in mind. As Cunningham was not the only light-skinned black man in the photograph array and as the pre-printed guidelines stated that hair length can change, we conclude that Cunningham’s argument lacks merit.

Tom’s testimony of Nelson’s statements

At trial, Tom testified as to the events surrounding Suzette’s disappearance. This testimony included the fact that he called several of Suzette’s friends to request their help in determining Suzette’s whereabouts. Tom testified that one man, known only as “Nelson,” told Tom that he would try to find information about Suzette. Nelson later called Tom back to tell him that he saw Suzette at the house of Cunningham’s brother on or about August 20, 1992. Defense counsel objected to the admission of both Nelson’s statements to Tom. The district court overruled the objections finding that the statements were non-hearsay because they were not offered to prove the truth of the matter asserted (whether Suzette was, in fact, at the house of Cunningham’s brother); rather, they went toward Tom’s state of mind as to what Tom thought about Suzette’s whereabouts and explained why Tom did not file a missing person’s report earlier. The court then instructed the jury as to the limited use of the statements. Cunningham now contends that the district court erred in this ruling.
We conclude that the district court was correct in its ruling that the statements were not hearsay statements because they were not offered for the truth of the matter asserted. See Wallach v. State, 106 Nev. 470, 473, 796 P.2d 224, 227 (1990) (holding that if a statement was merely offered to show that the statement was made and the listener was affected by it, then the statement was not *905 offered for the truth and is admissible as non-hearsay); Beddow v. State, 93 Nev. 619, 623, 572 P.2d 526, 529 (1977) (same).
Beddow further held that a limiting instruction as to the purpose of the statement minimizes any prejudice. Id. Since the district court supplied such a limiting instruction, we conclude that the district court did not err in allowing Tom to repeat Nelson’s statements.

The Oldtimer letter

The Oldtimer letter, which reflects the conversation between Cunningham and Wright while they were in jail, states in part, “The victim scratched [Cunningham’s] back up pretty good fighting for her life before she was stabbed to death in the chest and stomach 27 times in the area of Goodsprings and her body was hidden under some brush and branches heading for the California line!” As evidence of his adoption of the letter, Wright signed it at the top when the police presented it to him.
At trial, although Wright declared that he could not remember the conversation with Cunningham, he stated that the Oldtimer letter accurately reflected his memory of that conversation. Wright also expressed on the stand that he adopted the letter as his own. Additionally, portions of Wright’s taped conversation with the police were read at trial. Wright’s recorded statements reflect the fact that Cunningham had told Wright that Cunningham “stabbed [Suzette] and put her in the desert.”
The Oldtimer letter was admitted into evidence over the defense’s objection. The district court overruled the objection stating,
Mr. Wright has already testified that he saw a copy of that letter. It was shown to him by Detective Chandler. It was read to him, and then he adopted it as his statement; and then in evidence of the adoption of it, he signed his name at the top . ... I have no problem with the fact that it is an adoptive statement, and it could be admitted under that nature, all right? Despite the fact that the person who originally wrote it [Oldtimer] is not present for cross-examination, if it was read to [Wright], and he’s testified that he adopted it, then it could be admitted.
(Emphasis added.)
Cunningham now appeals, alleging that the document is a hearsay statement by Oldtimer, who is unavailable as a witness. We disagree and hold that because the statements were originally made by Cunningham and Wright had previously adopted Old- *906 timer’s recording of those statements, the letter is admissible as an adoptive statement.
NRS 51.035(3) provides that a statement is not hearsay if “[the] statement is offered against a party and is: ... (b) [a] statement of which he has manifested his adoption or belief in its truth.” This statute specifically addresses statements made by another which the party has adopted. However, we find no legislative prohibition against admitting statements made by the party and adopted by a witness who heard the statements. To the contrary, we note that the Federal Rules of Evidence specifically allow statements made by another and adopted by the witness to be admitted as past recollection recorded. See Fed. R. Evid. 803(5).
Here, Wright adopted the statement by signing his name on the Oldtimer letter shortly after it was written, when the conversation was fresh in Wright’s memory. In addition, Wright adopted the statement while on the stand. Although Wright testified that he could not remember his conversation with Cunningham, he contradicted himself by stating that the Oldtimer letter did accurately reflect his memory of what Cunningham told him about Cunningham’s involvement in Suzette’s murder. Plus, evidence was admitted that at the time of Wright’s first adoption, he did remember Cunningham’s statements. Therefore, Wright was subject to cross-examination and was competent to testify. His allegedly deficient memory of exactly what Cunningham stated to him is an issue of credibility left solely within the province of the jury. See Gaitor v. State, 106 Nev. 785, 790, 801 P.2d 1372, 1375-76 (1990). Accordingly, we conclude that the Oldtimer letter, reflecting Cunningham’s assertion to Wright and adopted by Wright when his memory was intact, was admissible as an adoptive statement.

Prosecutorial misconduct with respect to discussing manslaughter

During closing arguments, the prosecutor evaluated the evidence and discussed why he believed it amounted to first degree murder. In doing so, the prosecutor attempted to eliminate other types of homicide. After he started to discuss manslaughter, the defense objected, claiming that the prosecution was arguing crimes for which no instruction was offered.
In response, the prosecutor explained,
Your Honor, when [the jury is] getting to first degree, I want to tell them why first degree is the only appropriate one, and to do that I am taking away those considerations that *907 involved an accident and involuntary manslaughter. I’m going to be very short on those, but I think I have the right to take [the jury] through that to see the step progression — how we came to first degree and why it should be first degree.
The judge agreed that this argument merely set up the structure of how the prosecutor believes this to be first degree murder. We conclude that the district court did not err in allowing the prosecutor to discuss manslaughter and explain to the jury that this is not a manslaughter case.
In People v. Calpito, 88 Cal. Rptr. 64, 70 (Ct. App. 1970), the court held that an appellant must show that he was prejudiced by any alleged prosecutorial misconduct during closing arguments. Here, Cunningham makes no attempt to allege any prejudice resulted, nor does he provide any authority for this alleged error. Rather, he merely states that the elements of manslaughter were not before the jury and of no application to the case at hand.
In addition, Calpito, 88 Cal. Rptr. at 70, holds that “[i]t is within the domain of legitimate argument for a prosecutor to state his deductions or conclusions drawn from the evidence.” We conclude that the prosecutor’s argument consisted of mere deductions and was not improper. Accordingly, Cunningham’s argument is without merit.

Prosecutorial misconduct regarding the reference to Cunningham being in prison

During closing arguments, the prosecutor discussed the testimony of Patzig, a fellow prison inmate, with whom Cunningham allegedly spoke about the murder. To prevent potential prejudice that might have arisen if the jury had known Cunningham was in prison for another felony, the jury was led to believe that Cunningham was in jail pending the current charges when the discussion occurred.
The offensive comment and resulting interchange was:
[Prosecutor]: Mr. Patzig told you, there were only four people in prison who bragged to him about their murders.
[Defense counsel]: Objection, your Honor.
THE COURT: I believe his testimony was that — the testimony was that Mr. Cunningham was not in prison, Counsel, the other three were. That he was arrested and . . .
[Prosecutor]: That’s correct. I’m sorry.
THE COURT: . . . went to the Detention Center, or something like that with Mr. Cunningham. . . . So the jury is *908 instructed to disregard that. Mr. Cunningham wasn’t in prison at the time of the conversation allegedly with Mr. Patzig, but he was in custody in another facility.
[Prosecutor]: And I’m sorry for being imprecise there.
(Emphasis added.)
Cunningham argues on appeal that this reference to Cunningham being in prison violated NRS 48.045(2), which states in part, “Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith.” He proceeds to argue that the prosecution may not introduce evidence of other criminal acts of the accused. We conclude that Cunningham’s argument lacks merit.
The test for determining if a reference to a defendant’s prior •criminal history occurred “is whether ‘a juror could reasonably infer from the facts presented that the accused had engaged in prior criminal activity.’ ” Manning v. State, 99 Nev. 82, 86, 659 P.2d 847, 850 (1983) (quoting Commonwealth v. Allen, 292 A.2d 373, 375 (Pa. 1972)). See also Emmons v. State, 107 Nev. 53, 59, 807 P.2d 718, 722 (1991). After reviewing the reference to prison and the interchange immediately afterward, we conclude that the prosecutor’s inadvertent comment does not rise to the level of a reasonable inference regarding Cunningham’s prior criminal history.
Moreover, in White v. State, 95 Nev. 159, 162, 591 P.2d 266, 268 (1979), the prosecutor mistakenly stated that the defendant, rather than the victim, provided a certain comment at trial. The prosecutor immediately realized his mistake and corrected himself. The appellant argued on appeal that this was a comment of his failure to testify on his own behalf. This court held that “those words . . . amount to nothing more than a slip of the tongue which counsel promptly corrected.” Id. Likewise, in the present case, the prosecutor’s reference to prison was a mere slip of the tongue which was immediately corrected by the court and the prosecutor. Therefore, no error occurred.

Sufficiency of the evidence

Cunningham claims that the evidence at trial establishes first degree murder, not second degree murder; therefore, insufficient evidence exists to support the jury’s verdict. We conclude that this contention is without merit.
In Brinkman v. State, 95 Nev. 220, 592 P.2d 163 (1979), appellant argued that the evidence amounted to robbery with a *909 deadly weapon; therefore, the jury’s verdict of robbery without a deadly weapon was not supported by the evidence. This court held,
“[Wjhere a jury relieves a defendant of punishment for a greater offense . . . and convicts him of a lesser included offense ... the jury may have adopted its conclusion as an act of clemency. In such a case, the defendant cannot complain because the error does him no harm.”
Id. at 224, 592 P.2d at 165 (quoting State v. McCorgary, 543 P.2d 952, 960 (Kan. 1975), cert denied, 429 U.S. 867 (1976)).
Similarly, in the present matter, “[f]or whatever reason, the jury saw fit to convict appellant [here, Cunningham] of the lesser included offense” of second degree murder, rather than first degree murder. Id. at 223-24, 592 P.2d at 165. Accordingly, Cunningham cannot now complain that he was not convicted of first degree murder.
We further hold that sufficient evidence exists overall to support his murder conviction. Although Cunningham contested the evidence and presented impeachment witnesses, “[s]uch conflicting testimony addresses the sound discretion of the jury .... The jury is at liberty to reject the defendant’s version of events.” Porter v. State, 94 Nev. 142, 146, 576 P.2d 275, 278 (1978). Additionally, this court has held that circumstantial evidence alone may sustain a conviction. Deveroux v. State, 96 Nev. 388, 391, 610 P.2d 722, 724 (1980); see also United States v. Thurston, 771 F.2d 449, 452 (10th Cir. 1985) (holding that “[cjircumstantial evidence is entitled to the same weight as that given to direct evidence in determining the sufficiency of the evidence to support a verdict of conviction”).
Here, Tom testified that Cunningham made the remark about taking Suzette to the desert. Perry testified that he had no doubt that Cunningham was driving Suzette’s car one week after she disappeared. Evidence was presented that Cunningham bragged to Bradley, Wright, and Patzig that he had killed Suzette. Even without the Oldtimer letter, the jury still had plenty of properly admitted evidence to consider and reasonably believed that Cunningham did, indeed, make these statements. Consequently, after a thorough review of the record, we conclude that sufficient evidence supports Cunningham’s conviction for second degree murder.
Accordingly, we affirm Cunningham’s conviction for second degree murder with use of a deadly weapon.

 Tom testified that she was probably going through withdrawal because he stopped providing her with money to supply her crack habit.

 01dtimer was never identified.

 Cunningham was in prison on another felony charge. However, since this information was prejudicial, the attorneys and the judge took great care to hide this fact from the jury. Instead, the jury was informed that Cunningham was in jail pending the current charges.

 The photographic lineup contains three white men and three light-colored black or hispanic men. Therefore, even if Chandler was suggesting that the suspect was black, Perry had three men to choose from.

 Pre-printed on the back of the photo array was a statement that hair length and facial hair can easily change. Chandler testified that he always repeats this statement to witnesses.