141 Nev., Advance Opinion 52

IN THE SUPREME COURT OF THE STATE OF NEVADA

OCEAN CELESTINO CAMACHO,
Appellant,
vs.
THE STATE OF NEVADA,
Respondent.

No. 87039



FILED

NOV 06 2025

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY_____
DEPUTY CLERK

Appeal from a judgment of conviction, pursuant to a jury verdict, of two counts of first-degree murder with the use of a deadly weapon, conspiracy to commit murder, attempted murder with the use of a deadly weapon, and two firearm discharge offenses. Eighth Judicial District Court, Clark County; Jacqueline M. Bluth, Judge.

*Affirmed.*

Gaffney Law and Lucas J. Gaffney, Las Vegas,
for Appellant.

Aaron D. Ford, Attorney General, Carson City; Steven B. Wolfson, District Attorney, and John T. Afshar, Chief Deputy District Attorney, Clark County,
for Respondent.

_____

BEFORE THE SUPREME COURT, PICKERING, PARRAGUIRRE, and STIGLICH, JJ.

*OPINION*

By the Court, PICKERING, J.:

A jury convicted Ocean Camacho of two counts of first-degree murder with the use of a deadly weapon and other associated offenses. Camacho challenges his conviction on due process grounds, arguing that evidence of his pretrial identification should have been suppressed because it resulted from an unnecessarily suggestive photo array and was unreliable. He also argues that the district court reversibly erred when it denied his motion to suppress his statements to the police, did not timely rule on key pretrial motions, and refused to sever his trial from that of his codefendant. We reject these and Camacho's other claims of error and affirm.

I.

The convictions underlying this appeal grow out of a drug deal that ended in violence. Brandon Morales and two friends, Joshua Nunez and Humberto Oceguedo-Ramos, drove to a Las Vegas gas station, where they met Camacho and Anthony Martinez, Camacho's codefendant at trial. Although Nunez set up the meeting with Martinez as a drug buy, the plan was to steal the drugs.

The Morales group arrived first in his Kia SUV, which Morales backed into a parking space behind the gas station. Camacho and Martinez arrived a few minutes later in a gray Nissan Maxima and parked next to the Kia. Martinez got out of the Maxima and into the backseat of the Kia with Nunez. After Martinez handed Nunez the drugs, the two fought and Nunez shoved Martinez out of the Kia, which sped off. Camacho and Martinez chased after them in the Maxima, opening fire on the Kia as Camacho drove. When Morales saw that Nunez and Oceguedo-Ramos had




been shot, he pulled over to call for help. The Maxima did not stop. Nunez and Oceguedo-Ramos were taken to the hospital, where they died later that day.

Two hours after the shootings, Morales voluntarily gave a recorded statement to Detective Mitchell Dosch of the Las Vegas Metropolitan Police Department (LVMPD). The two met in Detective Dosch's police car. In his statement, Morales described the meeting at the gas station, the fight between Nunez and Martinez, the car chase, and the shootings. Morales said he didn't know the names of the two men in the Maxima but would recognize them on sight "[b]ecause I seen—I saw their face. I'm never gonna forget these guys." Morales described the driver as Hispanic, with long black or brown hair, in his 20s, with some facial hair or "maybe a little moustache," wearing a white T-shirt, and of medium build; he gave a different but similarly detailed description of the passenger. With Morales directing and Detective Dosch driving the police car, they retraced the car chase's 2.5-mile path. Video footage and shell casings collected along the route corroborated Morales's account.

The police found a phone in the Kia that held texts they traced to a phone belonging to Martinez. Martinez's phone records showed an exchange of calls and texts with another phone the night before the shootings. The texter suggested bringing a gun to the meeting and wrote, "I don't trust them FP" people—"FP" being a reference to a tagging group that Morales, Nunez, and Oceguedo-Ramos were members of. Police traced this phone to Monica Jauregi. When they located her residence, they found a gray Nissan Maxima parked in the driveway. Surveillance showed Jauregi leaving the residence with a long-haired Hispanic male whom police believed was Camacho.

Detective Dosch arranged for Morales to review two six-pack photo arrays. The showings occurred a week apart. The first array contained Martinez's photo; the second, Camacho's. Initially, Morales told police that he could not identify anyone in either array. But four days after Morales viewed the second array, the mother of one of the victims called Detective Dosch. She reported a conversation she had just had with Morales, who told her that he recognized both the driver and the passenger in the photos but intentionally did not tell the police. Detective Dosch immediately met with Morales and recorded the meeting. When shown the same photo arrays a second time, Morales identified Camacho as the driver of the Maxima and Martinez as its passenger and said he was "[a] hundred percent sure" of the identifications. Asked why he did not initially identify them, Morales said he wanted the men who killed his friends to "die on the streets," not "sit back and . . . brag about it in jail."

The day after Morales identified Camacho, LVMPD officers arrested Camacho at his home and transported him to the police station. There, Detective Dosch interrogated Camacho for a little over an hour. Before the interrogation began, Detective Dosch read Camacho his *Miranda* rights, which Camacho indicated he understood. Camacho made several arguably incriminating statements during the interview but did not confess to the crimes.

The State charged Camacho and Martinez with conspiracy to commit murder, two counts of first-degree murder with the use of a deadly weapon, attempted murder with the use of a deadly weapon, and other weapons-discharge offenses. Before trial, Camacho filed a series of pretrial motions seeking to suppress Morales's identification of him and his statements to Detective Dosch at the police station, as well as to exclude

text messages from Jauregi's phone and to sever his trial from Martinez's. Trial was delayed due to the COVID-19 pandemic, and the district court did not decide these motions until the pandemic-related restrictions were lifted. After multiple hearings, the district court denied Camacho's pretrial motions. At trial, over defense objection, the district court gave the jury a flight instruction based on Camacho and Martinez driving off after the Kia stopped.

Following a 14-day trial, the jury convicted both Camacho and Martinez on all counts. Camacho was sentenced to serve an aggregate prison term of 36 years to life.

II.

A.

Camacho argues that the district court violated his due process right to a fair trial by admitting evidence of Morales's pretrial identification of him. To prevail on this argument, Camacho must show that the "police-organized photo lineup . . . 'was so [unnecessarily] suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *Perry v. New Hampshire*, 565 U.S. 228, 238 (2012) (alteration in original) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)); *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967). The analysis proceeds in two steps. *See Thompson v. State*, 125 Nev. 807, 813, 221 P.3d 708, 713 (2009). First, we ask whether "law enforcement officers use[d] an identification procedure that is both suggestive and unnecessary." *Perry*, 565 U.S. at 238-39. If so, we move to the second step and consider whether the identification is nevertheless reliable. *Id.* at 241 (noting that "[t]he due process check for reliability . . . comes into play only after the defendant establishes improper police conduct"). "The factors affecting reliability include 'the opportunity of the witness to view the criminal at the time of the crime, the witness'

degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.'" *Sexton v. Beaudreaux*, 585 U.S. 961, 966 (2018) (quoting *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977)).

1.

Before addressing Camacho's challenge to the pretrial identification evidence, we must decide the applicable standard of review. The parties assume, as do some of our unpublished dispositions, that a district court's decision to admit pretrial identification evidence is reviewed deferentially, using the same abuse-of-discretion standard that applies to evidentiary rulings in general. *Johnson v. State*, No. 86153, 2024 WL 4783870, at *1-2 (Nev. Nov. 13, 2024) (Order of Affirmance) (concluding that "[t]he district court did not abuse its discretion by allowing testimony about pretrial identification"); *Brown v. State*, No. 60082, 2013 WL 5477164, at *3 (Nev. Sept. 26, 2013) (Order of Affirmance) (affirming admission of identification evidence and stating, "[b]ecause this is an evidentiary decision, we will only overturn it if the district court abused its discretion"); *cf. Thompson*, 125 Nev. at 811, 813, 221 P.3d at 711, 712-13 (referring to the abuse-of-discretion standard in summarizing the appellant's challenge to the pretrial identification evidence). The court of appeals, by contrast, has applied a mixed standard of review to pretrial identification evidence, reviewing "the district court's relevant factual findings for clear error and [its] ultimate legal conclusions de novo." *Sweeden v. State*, No. 87476-COA, 2024 WL 4531285, at *2 (Nev. Ct. App. Oct. 18, 2024) (Order of Affirmance).

Unpublished dispositions do "not establish mandatory precedent," NRAP 36(c)(2), and our published opinions do not resolve the conflict, because they do not expressly address the standard of review that applies. *Bias v. State*, 105 Nev. 869, 784 P.2d 963 (1989); *Banks v. State*, 94

Nev. 90, 575 P.2d 592 (1978).[1] But they appear to analyze the suppression of identification evidence as a mixed question of fact and constitutional law, not the exercise of discretion conferred by the evidence code. *Bias*, 105 Nev. at 871-72, 784 P.2d at 964-65 (framing the discussion in constitutional terms and stating that "Nevada case law concerning pre-trial identification is governed by the standard of *Stovall v. Denno*, 388 U.S. 293 (1967)"); *Banks*, 94 Nev. at 94-96, 575 P.2d at 594-95 (same); *see Cunningham v. State*, 113 Nev. 897, 904, 944 P.2d 261, 265 (1997) (independently assessing a photo array's suggestiveness in affirming the admission of pretrial identification evidence). And our decision in *Johnson v. State*, 118 Nev. 787, 794, 59 P.3d 450, 455 (2002), *overruled on other grounds by Nunnery v. State*, 127 Nev. 749, 772, 263 P.3d 235, 250-51 (2011), though decided in a different constitutional context, supports a mixed standard, reviewing the district court's factual findings for clear error and its legal conclusions de novo.

The appellant in *Johnson* challenged the district court's refusal to suppress evidence obtained through an allegedly unconstitutional search and seizure. *Id.* at 793-94, 59 P.3d at 455. He raised a second, evidence-code-based relevance challenge to the admission of a different piece of evidence. *Id.* at 795-96, 59 P.3d at 456. This court rejected both challenges but did so using two distinct standards of review. As to the evidence challenged as constitutionally inadmissible, we applied a mixed standard of

---

[1]The silence of our older precedent as to the standard of review is not unusual. *See United States v. Radaker-Carter*, 151 F.4th 840, 845 (6th Cir. 2025) (noting that courts did not routinely identify the relevant standard of review in their opinions until the late 1980s or early 1990s) (citing Amanda Peters, *The Meaning, Measure, and Misuse of Standards of Review*, 13 Lewis & Clark L. Rev. 233, 238 (2009)).

review: "Suppression issues present mixed questions of law and fact. While this court reviews the legal questions de novo, it reviews the district court's factual determinations for sufficient evidence." *Id.* at 794, 59 P.3d at 455. But we reviewed the admission of the assertedly irrelevant evidence, by contrast, for an abuse of discretion. *See id.* at 795, 59 P.3d at 456 (stating that "[t]his court will not overturn a district court's decision to admit or exclude evidence absent an abuse of discretion") (internal quotation marks omitted).

In *United States v. Radaker-Carter*, 151 F.4th 840 (6th Cir. 2025), the Sixth Circuit addressed the standard of review applicable to pretrial identification evidence specifically. Its caselaw, like ours, was "less than clear"; the court resolved the ambiguity by rejecting fully deferential review in favor of a mixed standard of review. *Id.* at 844. In doing so, it emphasized that "cases like this one present a legal question: whether the admission of identification evidence would violate a defendant's right to due process." *Id.* at 845 (citing *Perry*, 565 U.S. at 237). While that inquiry "often 'involves plunging into a factual record,'" in "'the constitutional realm, . . . the role of appellate courts in marking out the limits of [a] standard through the process of case-by-case adjudication favors *de novo* review of even mixed question[s].'" *Id.* at 845-46 (quoting *U.S. Bank Nat'l Ass'n v. Vill. at Lakeridge, LLC*, 583 U.S. 387, 396 n.4 (2018)).

Consistent with *Radaker-Carter* and our published *Johnson* decision, we hold that a mixed standard of review applies to a district court's decision on a motion to suppress pretrial identification evidence. Under this standard, we review the district court's factual findings for clear error. But we apply de novo review to a district court's "conclusions concerning whether the circumstances giving rise to the identification were

unnecessarily suggestive and whether the identification was otherwise reliable." *Id.* at 846.

2.

After an evidentiary hearing, the district court determined that admitting the Morales identification evidence did not violate Camacho's due process right to a fair trial. It concluded that the identification did not result from unnecessarily suggestive police procedures and was reliable in any event. On appeal, Camacho challenges both conclusions. Reviewing the district court's due process analysis de novo, we reject Camacho's challenges.

Camacho's main argument is that the photo array itself was unnecessarily suggestive because he was the only person with a white T-shirt on. This is significant, he maintains, because when Morales spoke to Detective Dosch two hours after the shootings, Morales described the driver of the Maxima as wearing a white T-shirt. Camacho also argues that the police did not need to use this photograph, since they had another one of him in a different colored shirt they could have used.

Where the other participants in a lineup or photo array are "grossly dissimilar in appearance to the suspect," or the suspect is the only one in a lineup or photo array wearing the same "distinctive clothing" described by a witness to the crime, *Perry*, 565 U.S. at 243 (quoting *United States v. Wade*, 388 U.S. 218, 233 (1967)), the identification evidence may be "so extremely unfair that its admission violates fundamental conceptions of justice," *id.* at 237 (internal quotation marks omitted). The photo array in this case does not approach that level. The array consisted of six headshots of Hispanic or mixed-race men with long dark hair, brown eyes, and moustaches, who appear to be of average weight and in their early twenties. Because the photos are headshots, they show only the necklines

of the subjects' shirts; with one possible exception, though, it looks as though they all had T-shirts on. An article of clothing as common and ubiquitous as a white T-shirt does not make a photo array unduly suggestive because the witness mentioned it in describing the suspect, especially where, as here, the photos focus on the subjects' face and hair, not their clothing; the fillers appear to be wearing similar, though different-colored clothing; and the witness's description did not emphasize clothing over other features. *See Thompson*, 125 Nev. at 813-14, 221 P.3d at 713 (rejecting a due process challenge to the identification by a witness who described her assailant as wearing a white T-shirt, despite that only the defendant and one other filler were wearing white T-shirts in the photo array); *accord United States v. Gershman*, 31 F.4th 80, 94 (2d Cir. 2022) (rejecting a due process challenge to the identification by a witness who described the defendant as wearing a black hoodie where, although only the defendant was shown in a black hoodie, the fillers wore similar style clothing), *cert. denied*, ___ U.S. ___, 143 S. Ct. 816 (2023); *People v. McBride*, 928 N.E.2d 1027, 1033 (N.Y. 2010) (rejecting a challenge where the witness described the defendant as wearing a gray sweatshirt—a "generic and common article of clothing"—only the defendant was shown wearing one, and the witness's description did not emphasize the sweatshirt); *see also United States v. House*, 823 F.3d 482, 486 (8th Cir. 2016) (similar; affirming admission of identification evidence where defendant was described as and the only one in the array with a ponytail but others had similar hair).

Camacho argues that the array was nonetheless *unnecessarily* suggestive because the police had another photo showing him in a blue shirt that "was just as clear" as the photo of him in a white T-shirt that was used. But the record does not support that the two photos are of equal quality or

the inference Camacho urges that the police chose the one they did to unfairly slant the identification process against him. At the evidentiary hearing on the motion to suppress, Detective Dosch testified that in selecting a suspect's photo for use in an array, what "we want to have [is] a clear and accurate depiction of their face." According to Detective Dosch, shirt color is not a searchable factor in the LVMPD database and did not influence the choice between Camacho's two photos. He explained that the police selected the photo they did because it depicted Camacho with his chin raised and his hair tucked behind his ears, so it clearly showed Camacho's facial features, while the other photo did not. After comparing the two photos, the district court rejected Camacho's position as not credible because it was not supported by the evidence. Having reviewed the copies of the photos in the appendices, we agree with the district court and conclude that the photo array was not rendered unnecessarily suggestive because the police used the higher quality photo of Camacho in compiling it.

Camacho also contests the procedure Detective Dosch followed when he showed Morales the same array a second time. When Morales first reviewed the array, he did not identify anyone but noted that the individuals in photos 3, 4, and 5 "have similar traits" as the driver. Camacho takes this to mean that Morales eliminated the individuals in photos 1, 2, and 6, so the police should have assembled a new array to show Morales that replaced these individuals with new fillers. And he objects to Detective Dosch showing Morales the same array twice in four days without having repeated the admonition he gave when he showed Morales the array the first time. These arguments overlook that Morales identified Camacho when he saw the array the first time; he just did not tell the police. The

second showing confirmed the earlier identification, which did not suffer the procedural flaws Morales ascribes to the second. As the State argues, changing the array to eliminate some photos while adding others would have created confusion, not lessened it. It is also "well settled that" two photo identification procedures in four days is "not inherently suggestive." *See People v. Vanvleet*, 34 N.Y.S.3d 274, 276 (App. Div. 2016) (internal quotation marks omitted).

Because Camacho failed to meet his burden to show that the photo array was unnecessarily suggestive, we do not need to consider whether Morales's identification of him was reliable. *See Perry*, 565 U.S. at 241; *Thompson*, 125 Nev. at 814, 221 P.3d at 713. Nevertheless, we note our agreement with the district court that the identification was sufficiently reliable that its presentation to the jury did not offend due process. The crime occurred in broad daylight, and Morales had the opportunity to see Camacho when he pulled into the gas station and parked next to the Kia and again during the car chase when the Maxima drew even with the Kia and shots were fired. Despite the stress involved, Morales recalled specific facts about the Maxima and its driver, including his race, build, hair color, facial hair, eye color, age, and the fact he was wearing a white T-shirt, which he reported to Detective Dosch two hours after the shooting. Setting aside Morales's initial refusal to tell the police he recognized Camacho in the photo array because he preferred "street" justice to avenge his friends' deaths, Morales's description of Camacho remained consistent from the time he first spoke to Detective Dosch until he identified Camacho 20 days later. Finally, Morales stated he was 100 percent sure of the identification. The questions Camacho seeks to raise as to the reliability of Morales's identification were, on this record, for the jury not the court to decide.

B.

Camacho challenges the district court's denial of his motion to suppress the statements he made when Detective Dosch interrogated him. First, Camacho contends Detective Dosch failed to ensure that Camacho knowingly and voluntarily waived his *Miranda* rights. He maintains that his interrogation occurred shortly after he was arrested by armed police officers at his home and transported to the stationhouse, which left him "terrified and amenable to Det. Dosch's psychological coercion." That psychological coercion allegedly consisted of Detective Dosch misleading Camacho regarding the law and making vague offers to help Camacho. Second, Camacho argues that Detective Dosch ignored three of his requests to end the interview, only ending the interview on the fourth request.

This court reviews de novo the voluntariness of a confession, although the factual findings underlying a district court's determination of voluntariness are reviewed deferentially for clear error. *Rosky v. State*, 121 Nev. 184, 190, 111 P.3d 690, 694 (2005). A criminal defendant "is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession." *Jackson v. Denno*, 378 U.S. 368, 376 (1964). "To determine the voluntariness of a confession, the court must consider the effect of the totality of the circumstances on the will of the defendant," including

> the youth of the accused; his lack of education or his low intelligence; the lack of any advice of constitutional rights; the length of detention; the repeated and prolonged nature of questioning; and the use of physical punishment such as the deprivation of food or sleep.

*Passama v. State*, 103 Nev. 212, 214, 735 P.2d 321, 323 (1987).




The record does not support that the statements Camacho made during his interrogation were involuntary. Detective Dosch read Camacho his *Miranda* rights, and Camacho responded "yes" when asked if he understood those rights. Although young, Camacho was a legal adult, a high school graduate, and of average intelligence. He had previous experience with the police and was on probation at the time. The interview was short—just over an hour—and Camacho was not subject to any physical punishment. After reviewing a video of the interrogation, which was not included in the record on appeal, the district court found that both sides were calm and respectful when communicating. *See Johnson v. State*, 113 Nev. 772, 776, 942 P.2d 167, 170 (1997) (noting that this court will accept a district court's findings when based on evidence appellant did not include in the record on appeal). And, although Camacho argues that the trauma of his arrest rendered his subsequent statements involuntary, he adduced no evidence to support that argument.

Nor does the record support that Detective Dosch tricked Camacho into speaking by promising to help him secure reduced punishment. The relinquishment of a *Miranda* right "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). As the district court concluded, Detective Dosch's actions were not deceptive or coercive. He vaguely indicated he could help Camacho, alluding to different degrees of punishment, but he did not specify the help he could provide or make any promises. And Detective Dosch did not threaten Camacho with harsher punishment for not cooperating or otherwise engage in impermissibly coercive tactics.

Last, the record belies Camacho's argument that Detective Dosch ignored three of his requests to end the interview, only ending the interview on the fourth request. Camacho's first three statements did not unambiguously ask to end the interview. They came in response to specific questions and indicated that Camacho would rather be sitting in jail than answer the questions posed. See *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010) (explaining the defendant's statement must be unambiguous). The moment that Camacho said that he no longer wished to speak, Detective Dosch ended the interview. Accordingly, we conclude that the district court did not err in denying his motion to suppress the statements.

C.

Camacho argues that the district court's delay in ruling on his motions to suppress Morales's identification and his statements to Detective Dosch, along with his motion to exclude the text messages on Jauregi's phone, prejudiced him at trial and violated his due process rights. Although Camacho filed those motions in September 2018, the district court did not rule on them until 2022. Camacho argues this delay forced him to make concessions he otherwise would not have made and that Morales's memory faded significantly over the years between identification and trial, thus prejudicing him.

Camacho uses a novel legal theory to challenge the district court's delay in ruling on his pretrial motions. He does not argue that the delay violated his Sixth Amendment or statutory speedy trial rights. Indeed, Camacho admits in his briefing that he waived his statutory right to a speedy trial. Rather, Camacho styles his challenge as a due process challenge, arguing that caselaw allows defendants to challenge slow rulings as due process violations. Camacho cites *Jones v. State*, 96 Nev. 240, 242, 607 P.2d 116, 117 (1980) (involving unreasonable preindictment delay);

*State v. Autry*, 103 Nev. 552, 553, 746 P.2d 637, 638 (1987) (involving prearrest delay); and *United States v. $307,970.00, in U.S. Currency*, 156 F. Supp. 3d 708, 717 (E.D.N.C. 2016) (involving civil asset forfeiture). Critically, in all of those cases, the speedy trial right either did not apply or had not yet attached; the two Nevada cases involved prearrest delays, while the federal case was a civil case.

Here, where the speedy trial right did apply and Camacho neither invoked the right nor asserted that it had been violated, Camacho asks this court to analyze the delayed rulings as due process violations. Camacho suggests that, to determine whether his due process rights were violated, this court should apply the speedy trial right test to each of these delayed rulings. The speedy trial right test looks to "whether delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice" due to that delay. *Doggett v. United States*, 505 U.S. 647, 651 (1992); *see State v. Inzunza*, 135 Nev. 513, 516, 454 P.3d 727, 731 (2019) (holding that Nevada follows the *Doggett* test when analyzing constitutional speedy trial right violations).

We need not determine whether Nevada law recognizes a due process right to timely motions rulings, because even if it did, Camacho would fail the *Doggett* test that he proposes applies. On the first *Doggett* factor, the relevant period Camacho waited was four years, as this was the time period between making those motions and receiving the last ruling on them. However, on the next *Doggett* factor, the record shows Camacho and external factors were more at fault for the delay than the State. Through late 2019, defense counsel for each defendant moved for continuances. After

the COVID-19 pandemic struck, Camacho asked that the court "suspend all proceedings until there is a vaccine." The pandemic delayed these proceedings in a unique way that cannot be held against either party.

Most importantly, Camacho fails on the last *Doggett* factor because he does not show he suffered prejudice from the delayed rulings. The district court ruled on his photo identification motion in March, months before his October 2022 trial, giving his counsel adequate time to prepare. Because Morales was the State's witness, his fading memory of the crime would likely have helped, not hurt, Camacho, and Camacho's argument that Morales could have provided information favorable to Camacho had his memory not faded is speculative. Camacho likewise fails to show he suffered prejudice from the delayed ruling on his text-messages motion. Because Camacho fails to sufficiently brief his other, related contentions, we do not consider them. *See Mazzan v. Warden*, 116 Nev. 48, 75, 993 P.2d 25, 42 (2000).

### D.

Camacho complains that the district court should have granted his motion to exclude evidence of the incriminating text messages found on Jauregi's phone because the State failed to authenticate them as messages that he sent. A district court's decision to admit evidence is reviewed for an abuse of discretion. *See Mclellan v. State*, 124 Nev. 263, 267, 182 P.3d 106, 109 (2008). "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence or other showing sufficient to support a finding that the matter in question is what its proponent claims." NRS 52.015(1). "[E]stablishing the identity of the author of a text message through the use of corroborating evidence is critical to satisfying the authentication requirement for admissibility." *Rodriguez v. State*, 128 Nev. 155, 162, 273 P.3d 845, 849 (2012).

The text messages discussed the proposed drug deal and the people involved. Camacho did not own that phone, which belonged to his girlfriend, Jauregi. And Camacho did not identify himself as the sender on all the messages he allegedly wrote. However, the State offered corroborating evidence sufficient to support that Camacho had access to and used Jauregi's phone and, in fact, authored the text messages in question. Although two people used the phone, the texts in question refer to the drug deal in which Martinez and Camacho participated. Geolocation data showed the phone moving from an area near Camacho's residence, to an area where the car chase started and the victims were shot, then back to the residence on the date and time the crime occurred. No evidence apart from the phone placed Jauregi anywhere near the scene of the crime. On this record, the State sufficiently authenticated the messages as Camacho's; the district court did not abuse its discretion when it so held.

E.

The district court denied both Camacho's and Martinez's motions to sever their trials. Camacho asserts that he had planned to argue that he acted under duress because Martinez had a gun. In direct juxtaposition, Martinez had planned to argue that his fear of Camacho led him to commit the crime. Camacho claims that he was denied a specific trial right because "the State planned to play portions of Martinez'[s] statement . . . implicat[ing] himself and Camacho." Camacho also maintains that because Martinez argued in closing that he was neither the driver nor the shooter, Martinez's defense implied that Camacho was responsible for the shooting.

This court reviews an order denying a motion to sever for an abuse of discretion. *Chartier v. State*, 124 Nev. 760, 763-64, 191 P.3d 1182, 1184-85 (2008). Severance is appropriate "only if there is a serious risk that

(O) 1947A

a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Marshall v. State*, 118 Nev. 642, 648, 56 P.3d 376, 380 (2002) (internal quotation marks omitted). If a "defendant seeking severance" argues that trial severance is warranted because of incompatible defenses, not only must they "show that the codefendants have conflicting and irreconcilable defenses," but also that "there is danger that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty." *Id.* at 646, 56 P.3d at 378 (internal quotation marks omitted). Only where the defendant can show that erroneously denying severance caused "a substantial and injurious effect" on the jury's verdict will this court reverse. *Chartier*, 124 Nev. at 765, 191 P.3d at 1185 (internal quotation marks omitted).

We addressed and rejected codefendant Martinez's severance argument in our order affirming his conviction. *Martinez v. State*, No. 87048, 2024 WL 3841723, at *1-2 (Nev. Aug. 14, 2024) (Order of Affirmance). Similar to Martinez, Camacho was not entitled to severance. The fact that each defendant tried to blame the other does not support severance, because it did not appear that the conflict alone would leave the jury to conclude that both were guilty. The district court did not abuse its discretion in denying severance.

F.

The district court gave the jury a "flight" instruction over Camacho's objection. He contends that this was an abuse of discretion because no evidence supports that he left the crime scene with a consciousness of guilt or for the purpose of avoiding arrest. In Camacho's view, the crime occurred while the cars were moving and the fact that Camacho's car continued on after the shooting ended does not indicate guilt.

We review the decision to issue a flight instruction for abuse of discretion, *Tavares v. State*, 117 Nev. 725, 734 n.21, 30 P.3d 1128, 1133 n.21 (2001), *holding modified on other grounds by Mclellan v. State*, 124 Nev. 263, 182 P.3d 106 (2008), subject to harmless error analysis, *see* NRS 178.598 ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."). "Flight is more than merely leaving the scene of the crime." *Potter v. State*, 96 Nev. 875, 876, 619 P.2d 1222, 1222 (1980). A flight instruction is proper when there is evidence that the defendant fled "with a consciousness of guilt" in order to avoid arrest. *Weber v. State*, 121 Nev. 554, 582, 119 P.3d 107, 126 (2005) (internal quotation marks omitted), *overruled on other grounds by Farmer v. State*, 133 Nev. 693, 405 P.3d 114 (2017). Evidence that a defendant fled with a consciousness of guilt and to avoid arrest must be more than speculative. *Guy v. State*, 108 Nev. 770, 777, 839 P.2d 578, 583 (1992).

Camacho's codefendant Martinez raised this same issue in his appeal, and we held that the flight instruction was improper. *Martinez*, 2024 WL 3841723, at *2-3 (determining that as Martinez was the passenger in the vehicle, he had no say in the matter). Despite the distinction between the two cases, there is no reason for us to reach a contrary decision here. The State presented no evidence that Camacho left the crime scene with either a consciousness of guilt or to avoid arrest and does not point to any facts beyond "a mere going away" to support the flight instruction. *Weber*, 121 Nev. at 582, 119 P.3d at 126. That Camacho failed to call 911 or to stop and render aid are inactions that are insufficient to justify a flight instruction. Otherwise, every time a defendant fails to render aid or take steps to help the victim, a court could give a flight instruction. Under *Weber*

SUPREME COURT
OF
NEVADA

(O) 1947A

20

and *Guy*, additional facts suggesting consciousness of guilt and intent to avoid arrest are required for a flight instruction to be given.

However, we conclude that the error was harmless. *See Potter*, 96 Nev. at 876, 619 P.2d at 1222-23 (affirming a judgment of conviction despite the district court's erroneous use of a flight instruction because it did not result in a miscarriage of justice or prejudice the defendant's substantial rights). The sheer amount of evidence the State presented against Camacho, including Morales's identification of him, the text messages, the geolocation data, and video surveillance footage showing a Nissan Maxima like that Camacho had access to chasing the Kia, supports that the instruction did not affect the verdict, cause a miscarriage of justice, or prejudice his substantial rights.

## G.

Camacho last argues that the cumulative effect of the alleged errors violated his due process right to a fair trial. *See Valdez v. State*, 124 Nev. 1172, 1195, 196 P.3d 465, 481 (2008) ("The cumulative effect of errors may violate a defendant's constitutional right to a fair trial even though errors are harmless individually." (internal quotation marks omitted)). But he has shown only one error—the giving of the flight instruction—and as a result, his cumulative error challenge fails. *United States v. Sager*, 227 F.3d 1138, 1149 (9th Cir. 2000) ("One error is not cumulative error."); *Pascua v. State*, 122 Nev. 1001, 1008 n.16, 145 P.3d 1031, 1035 n.16 (2006) (explaining that where "errors were insignificant or nonexistent, the cumulative effect of those errors cannot be found to have deprived [the defendant] of a fair trial, especially in consideration of the evidence presented against her").

Because Camacho has not demonstrated reversible error, we affirm.

_Pickering_ , J.
Pickering

We concur:

_Parraguirre_ , J.
Parraguirre

_Stiglich_ , J.
Stiglich

SUPREME COURT
OF
NEVADA

(O) 1947A